John Cary SIMS and Sidney M. Wolfe, M.D., Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY, Defendant.

Civ. A. No. 78–2251.

United States District Court, District of Columbia.

Aug. 7, 1979.

As Amended Aug. 13, 1979.

Paul Alan Levy, David C. Vladeck, Washington, D. C., for plaintiff.

John Oliver Birch, Asst. U. S. Atty., Washington, D. C., for defendant.

OBERDORFER, District Judge.

## MEMORANDUM

### I.

Plaintiffs are pressing a Freedom of Information Act ("FOIA") request for disclosure of (1) the names of universities and other institutions that received funding from the defendant for the so-called MK–ULTRA program, as well as the names of the principal researchers at each institution; and (2) the grant proposals and contracts awarded under the MK–ULTRA program.[1]

---

1. The grant proposals and contracts have been disclosed by the CIA pursuant to previous FOIA requests. Plaintiffs had complained that restrictive CIA "reading room" hours had de-

That program involved behavioral modification research, primarily with human subjects. Through such research, the CIA hoped to better understand "brainwashing" techniques purportedly used by foreign governments. The CIA also sponsored the research in the hope that it might discover means of obtaining information from foreign agents. *See generally* Affidavit of CIA Director Stansfield Turner (May 13, 1979) (copy attached as appendix to this Memorandum).

Defendant voluntarily has responded to plaintiffs' FOIA request by releasing approximately two-thirds of the names of the institutions that were involved.[2] It is reluctant to disclose the names of the remainder of the cooperating institutions, claiming that they are "intelligence sources" within the meaning of 50 U.S.C. § 403(d)(3) and therefore exempt from disclosure by 5 U.S.C. § 552(b)(3). The defendant also declines to disclose the names of researchers, urging that they also are exempt "intelligence sources." Defendant finally claims that release of the individual names would invade the privacy of the individual researchers in contravention of 5 U.S.C. § 552(b)(6). Plaintiffs counter by alleging that the CIA's withholding of the names of the institutions and researchers is not warranted by FOIA exemptions. The parties have filed cross-motions for summary judgment that support their divergent views.

On April 12, 1979, this Court requested the parties to submit supplemental briefs addressing, *inter alia,* the question whether a CIA promise of confidentiality to institutions and/or researchers participating in the MK–ULTRA program might create a contractual right of non-disclosure. The Court further requested the CIA to prepare a draft of a form letter to be sent to each institution and to each researcher whose name remained undisclosed, inquiring whether the addressee relied on any CIA commitment of anonymity in agreeing to participate in the MK–ULTRA program and whether the addressee still wished to remain anonymous.

In an accompanying Memorandum, the Court ruled that defendant had failed to establish that either the institutions or the individual researchers were "intelligence sources" as that term is used in 50 U.S.C. § 403(d)(3) for purposes of exemption under 5 U.S.C. § 552(b)(3). The Court hypothesized that the institutions and researchers might nevertheless have a common law or constitutional right to protection of their anonymity and that enforcement of such a right might have a side-effect beneficial to the public interest: protection of CIA anonymity commitments to persons with whom it established intelligence-related relationships.

The parties responded to these suggestions by briefs and, in the case of the defendant, with an extensive affidavit by CIA Director Stansfield Turner. Neither brief embraces the theory that there is any contract or constitutional right of the institutions or researchers that would bar disclosure of their names, if disclosure were required by FOIA. Indeed, defendant made no showing that the researchers and institutions in this case were given promises of confidentiality. *See* note 6, *infra.* Instead, defendant's brief and Director Turner's affidavit renew the contention that the institutions and individual researchers participating in the project are intelligence sources and that the Director is required by the National Security Act to protect them from disclosure. *See* 50 U.S.C. § 403(d)(3).

## II.

Our Court of Appeals ruled, prior to 1976, that 50 U.S.C. § 403(d)(3), authorizing the Director to "protect . . . intelligence

---

nied them access to the documents. The Court disposed of that claim by Order of April 12, 1979.

**2.** The CIA released only the names of the institutions that did not object to the release. The names released include Cornell University, the University of Michigan, Stanford University School of Medicine, Princeton University, Harvard University and the Massachusetts Institute of Technology.

sources and methods," is "precisely the type of statute comprehended by [FOIA's] exemption (b)(3)." *Weissman v. CIA,* 184 U.S. App.D.C. 117, 120, 565 F.2d 692, 694 (1977). In 1976, however, Congress amended (b)(3) to narrow the class of statutes that qualify under the (b)(3) exemption. Congress was concerned that the Supreme Court's interpretation of the exemption in *FAA Administrator v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), permitted agencies too much discretion in deciding the information that was subject to FOIA disclosure. Accordingly, Congress amended (b)(3) to permit the withholding of information that was exempted under certain statutes, but only if the protecting statute:

> (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

The (b)(3) amendment, as explained in *Ray v. Turner,* 190 U.S.App.D.C. 290, 308, 587 F.2d 1191, 1219 (1978) (Wright, C. J., concurring), "removed the *Robertson* loophole by insuring that no agency could rely on an 'exempting' statute unless the statute contained clear guidelines upon which a court could rely in reviewing the agency's refusal to disclose requested information."

Despite the 1976 stiffening of (b)(3), our Court of Appeals recently has ruled that the amendment was not intended by Congress "to upset the well-established Exemption 3 status" of 50 U.S.C. § 403(d)(3). *Goland v. CIA,* 197 U.S.App.D.C. 25, at 36, 607 F.2d 339 at 350 (D.C.Cir. 1978). In that case the Court of Appeals affirmed the withholding of certain classified portions of a 1948 statement by the then CIA Director. The Court emphasized that the passages in question were described in a "non-conclusory and detailed affidavit" that described, among other things, " 'intelligence collection and operational devices . . . still utilized' and . . . 'basic concepts of intelligence methodology' of

which 'the essential elements remain viable.' "

Despite *Goland's* identification of 50 U.S.C. § 403(d)(3) as a statute that qualifies for incorporation under the strict rules of FOIA's newly amended (b)(3) exemption, our Court of Appeals has warned on other occasions that § 403(d)(3)'s qualification under (b)(3) is not automatic. In *Ray v. Turner, supra,* for example, Chief Judge Wright noted that even though § 403(d)(3) falls under the (b)(3) exemption because it "refers to particular types of matters to be withheld,"[3] § 403(d)(3)'s language regarding protection of "intelligence sources and methods" is "potentially quite expansive." *Id.* 190 U.S.App.D.C. at 321, 587 F.2d at 1220. He concluded that in order to fulfill Congress' intent to close the *Robertson* loophole, "courts must be particularly careful when scrutinizing claims of exemptions based on such expansive terms." *Id.*

Chief Judge Wright's concerns with the potential expansiveness of § 403(d)(3) recently were echoed by our Court of Appeals in a related context. In *The Founding Church of Scientology v. National Security Agency,* 197 U.S.App.D.C. ——, 610 F.2d 824 (1979), the Court evaluated the National Security Agency's claim that Section 6 of Public Law No. 86–36[4] authorizes the withholding of certain documents under (b)(3). That statute permits the Agency to withhold, *inter alia,* "information with respect to the *activities* [of the National Security Agency]." (emphasis added). The Court found that the provision generally satisfies the strictures of (b)(3) because it "refers to particular types of matters to be withheld." *See* 5 U.S.C. § 552(b)(3)(B). The Court declined, however, to withhold the information in question until defendant filed detailed affidavits describing the documents in question. The Court requested supplemental affidavits in order to be certain that the information sought to be withheld concerns only those "activities" of the NSA that obviously

---

3. *See* 5 U.S.C. § 552(b)(3)(B).

4. 73 Stat. 64 (1959); 50 U.S.C. § 402 note (1976).

qualify for nondisclosure under Section 6 and (b)(3). It warned that Section 6 had a "potential for unduly broad construction" that might run at cross purposes with FOIA's "overwhelming emphasis on disclosure." 197 U.S.App.D.C. at ——, 610 F.2d at 828. As the Court noted: "a term so elastic as 'activities' should be construed with sensitivity to the 'hazard[s] that Congress foresaw.'" At ——, 610 F.2d at 829.

■ Applying the learning of *Goland, Ray,* and *The Church of Scientology* to the case here, the Court first reaffirms that § 403(d)(3) generally qualifies for incorporation under the (b)(3) exemption because it "refers to particular types of matters to be withheld," *viz.* "intelligence sources and methods." The Court also finds, however, that in the peculiar circumstances of this case, § 403(d)(3) does not "refe[r] to particular types of matters to be withheld" with sufficient precision to qualify for FOIA's (b)(3)(B) exemption. Defendant has failed to demonstrate to the Court either by detailed affidavits or by clear guidelines that its decision to treat the MK–ULTRA institutions and researchers as "intelligence sources" under § 403(d)(3) is not an overbroad application of the term, too susceptible to administrative discretion to pass muster under (b)(3). Accordingly, the Court denies defendant's motion for summary judgment, and grants summary judgment in favor of plaintiffs on this issue.

Three reasons compel this result. First, unlike the courts in *Goland* and *Scientology,* this Court cannot look to detailed agency affidavits that describe MK–ULTRA activities and thereby assure itself that the MK–ULTRA projects involved intelligence-related work and that the institutions and researchers can be recognized as "intelligence sources." The MK–ULTRA records were destroyed by the CIA in 1973 and therefore are apparently not susceptible to detailed description.

Second, because details were not available either to the incumbent Director or to the Court, both have been required to rely on generalized observations to determine whether the term "intelligence sources" may be applied to institutions or researchers in the present case. It is apparent from the face of the Director's affidavit that his definition of the institutions and researchers as intelligence sources is not well tied to particular facts and is "potentially quite expansive." *See Ray v. Turner,* 190 U.S. App.D.C. at 321, *supra,* 587 F.2d at 1220. Nor does the affidavit offer "clear guidelines" from which the Court can conclude that his decision to treat the institutions and researchers as "intelligence sources" is not discretionary or overbroad. Instead, the Director has characterized an intelligence source as any "contributor  .  .  . to the intelligence process." This definition is susceptible to discretionary application and overbroad interpretation.[5]

Third, the question whether the MK–ULTRA institutions and researchers are "intelligence sources" qualifying for a (b)(3) exemption is a case at the margin. The Court would not hesitate to apply the (b)(3) exemption to most of the sources of information identified by the Director's affidavit as "intelligence sources," *e. g.,* CIA operatives, couriers who transport secret materials, etc. The present situation, however, involves behavioral research that was carried on, for the most part, at American universities, with the witting or unwitting participation of American students, for a purpose which may be collateral to the main business of intelligence, and to an uncertain result. In a context such as this, the Court cannot validate the Director's determination that the institutions and researchers involved were "intelligence sources" without a strong and detailed showing of the work done under the auspices of MK–ULTRA or,

5. For a more complete definition of intelligence sources, the affidavit refers to Executive Order 12036, issued by President Carter on January 24, 1978, and to a definition approved by the Special Coordination Committee of the National Security Council and by the President, and provided to the Senate Select Committee on Intelligence for inclusion in Senate Bill 2525 of the 95th Congress. These other definitions offered by the Director in his affidavit are equally susceptible to discretionary application and overbroad interpretation.

if that does not make it obvious that intelligence sources are involved, by the identification of clear, non-discretionary guidelines to test whether an intelligence source is involved in a particular case. The Director has failed to meet this burden.

In reaching this decision, the Court has given careful consideration to the Director's expressed concern that disclosure of the names might impair his ability to carry out his statutory duty of protecting the defendant's intelligence sources. Performance of this duty requires him to be able to strictly honor commitments of anonymity made to such sources by and on behalf of the defendant. In fact, it was in recognition of these concerns that the Court suggested earlier that the institutions and researchers participating in the project in reliance on such commitments might have a contract right to anonymity.[6]

The Court also notes that the policy objectives which concern the Director might very well be accommodated by classifying the lists of names of institutions and researchers pursuant to Executive Order 12065, so that the lists would be exempt from disclosure by 5 U.S.C. § 552(b)(1).[7] In fact, the lists were once so classified, but the defendant has since elected to declassify them so that they are not now exempt under (b)(1). Nothing in the Court's ruling that (b)(3) is inapplicable to the lists here at issue is intended to foreclose (or approve) new classification of the lists and resort to section (b)(1) in order to protect any commitment to anonymity made by defendants to any institution or researchers. The effective date of the accompanying order has been set forward to October 1, 1979 in order to permit the defendant to reexamine and act on the possibility of classifying the names of institutions and researchers which would otherwise be disclosable and to

amend the motion and opposition to invoke (b)(1), if it should elect to do so.

## III.

█ Defendant also urges the Court to withhold the names of the individual researchers involved in the MK–ULTRA projects on the ground that the names are exempt from disclosure under 5 U.S.C. § 552(b)(6). That FOIA provision authorizes the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

Application of the (b)(6) exemption requires the Court to determine whether "personnel and medical files and similar files" are involved, and then to balance the privacy interest against the public interest in disclosure of the materials. *See generally Department of Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). Applying these standards here, the names of the MK–ULTRA researchers may be exempt from FOIA disclosure.

First, the CIA records in question have many characteristics of "personnel and medical files and similar files." They are financial in nature, detailing MK–ULTRA funding. They identify both the institutions receiving money under the project, and the principal researchers. The files thus contain "personal data"—the names of principal researchers. The inclusion of the names of the researchers in the context of CIA–funded research may implicate personal privacy concerns resembling those at stake in the specific personal data maintained by the Department of Health, Education and Welfare. *See id.* at 375, 96 S.Ct. 1592. Such a claim would be particularly strong in cases where researchers participated in reliance on actual or implied com-

---

**6.** The Director's affidavit conspicuously does not represent that the institutions or researchers in this case received expressed or implied commitments of anonymity. *Cf.* Affidavit of Stansfield Turner ¶ 10 (May 13, 1979).

**7.** 5 U.S.C. § 552(b)(1) states that FOIA disclosure requirements do not apply to matters that are: "(A) specifically authorized under criteria

established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (b) are in fact properly classified pursuant to such Executive Order." Executive Order 12065 describes classification standards of sensitive materials. *See, e. g., Kanter v. Department of State,* 479 F.Supp. 921 (D.D.C.1979).

mitments that they could do so anonymously. The files thus have functional characteristics in common with and therefore are "similar" to classic personnel or medical files.

Second, disclosure of the names of the researchers may constitute a "clearly unwarranted invasion of privacy." The public interest served by further exposing the MK–ULTRA project and the possible role of universities and colleges must be weighed against concern that publicity about individual researchers' associations with the projects may seriously affect their careers and other personal relationships, causing both embarrassment and possible harassment. *See generally Wine Hobby, U.S.A., Inc. v. IRS,* 502 F.2d 133, 135–37 (3d Cir. 1974); *Rural Housing Alliance v. Dept. of Agriculture,* 162 U.S.App.D.C. 122, 498 F.2d 73, 76–77 (1974). This risk of embarrassment is aggravated in the case of any researchers who were unwitting participants in CIA research.

Evaluation of the applicability of the (b)(6) exemption to the researchers requires additional information as to whether any researcher had any reasonable expectation that his or her participation would be anonymous, as to whether any researcher has any other privacy interests which might be compromised by disclosure of participation in the project or whether any researcher has any other objection or reason for objection to disclosure of his or her name. To this end, the Court is affording the defendant additional time in which to communicate with former researchers about the foregoing, using the form of letter suggested to the Court, or any other process which the defendant believes will elicit the information needed for resolution of this issue.

If the defendant elects to pursue the (b)(6) exemption, it should submit, on or before October 1, 1979, *in camera,* a list of the names of the researchers with whom defendant has communicated and an indication as to what objection, if any, the researcher may have to disclosure of his or her name, and the reason. Any affidavit filed, *in camera,* shall be accompanied by an affidavit to be filed publicly containing the same information, except for the researchers' names. If the defendant elects not to file these affidavits or otherwise move, on or before October 1, 1979, it will be deemed to have abandoned its (b)(6) exemption claim.

## APPENDIX

### AFFIDAVIT

STANSFIELD TURNER does depose and say as follows:

1. I am the Director of Central Intelligence. I have served in that office since 9 March 1977.

2. As Director of Central Intelligence, I am the executive head of the Central Intelligence Agency (CIA). The CIA was established by the National Security Act of 1947, 50 U.S.C. § 403, *et seq.,* as was the position of Director of Central Intelligence. Section 102(d)(3) of the Act, 50 U.S.C. § 403(d)(3), provides in part: "That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."

3. I have read the Complaint in this action, and I am generally familiar with this litigation. Specifically, I have read the Court's Memorandum and Order in this case, dated 12 April 1979, and note that the Court has stated in its Memorandum that it finds that the institutions and individual researchers who participated in Project MKULTRA "are not intelligence sources." Given the dictionary definition of "source" and given the generally perceived meaning of that word, I can, of course, understand the basis for the Court's belief. The purpose of this affidavit is, therefore, to familiarize the Court with some of the techniques employed and problems encountered by the CIA in the performance of its statutory duties as the central agency within the United States Government with the primary responsibility for conducting intelligence activities for the United States. It is my judgment that the institutes and individual researchers who participated in Project MKULTRA are intelligence sources

and that, therefore, it is my responsibility under the National Security Act to protect them from disclosure to the extent that I determine that such protection is in the interest of national security and is necessary to enable the CIA to perform its statutory functions effectively.

4. The term "intelligence sources" is a phrase of art, encompassing a variety of entities. By that I do not mean that it is so vague or imprecise as to shroud whatever the CIA may wish to conceal. But certainly, it includes more than simply those individuals directly involved in collecting and reporting foreign intelligence information. To accomplish its intelligence collection responsibilities, the CIA must engage in a variety of related activities. Executive Order 12036, issued by President Carter on January 24, 1978, sets forth the duties and responsibilities of the CIA. It provides in part:

1–8. *The Central Intelligence Agency.* All duties and responsibilities of the CIA shall be related to the intelligence functions set out below. As authorized by the National Security Act of 1947, as amended, the CIA Act of 1949, as amended, and other laws, regulations and directives, the CIA under the direction of the NSC, shall:

1–801. Collect foreign intelligence, including information not otherwise obtainable, and develop, conduct or provide support for technical and other programs which collect national foreign intelligence

. . .

\* \* \* \* \* \*

1–804. Conduct counterintelligence activities outside the United States and coordinate counterintelligence activities conducted outside the United States by other agencies within the Intelligence Community;

\* \* \* \* \* \*

1–806. Produce and disseminate counterintelligence studies and reports;

\* \* \* \* \* \*

1–810. Carry out or contract for research, development and procurement of technical systems and devices relating to authorized functions.

5. To further illustrate, the classic figure of the secret agent reporting from abroad on the intentions of a hostile foreign power is easily understood even by those unversed in the craft of modern intelligence. But there are other less obvious, but equally important, contributors to the intelligence process who are considered intelligence sources. There is the safehouse keeper who must provide a safe haven and secure meeting place. There is the courier whose function is to securely transport material even though the contents may be unknown to him. An access agent's function is to provide entree to another individual who in turn may be recruited or used unwittingly as an intelligence source. A cut-out is an individual who serves as a facade, concealing the fact that the ultimate recipient of information is American intelligence. Rather than collecting information, a source may be used as a channel for disseminating misinformation, to confuse and mislead a hostile foreign government. So too, the individual who conceived the idea of a particular high altitude photographic platform utilizing previously untried technology and who offered his idea to the CIA was an intelligence source. Had his association with the CIA or the Agency's interest in his concept been revealed in an untimely fashion, the intelligence benefits which resulted from the development of the U–2 reconnaissance aircraft might never have been realized.

6. This iteration of examples of intelligence sources could be continued, but it is not without limits. The problem in formulating a definition of intelligence sources is to insure that it is neither overly broad nor excessively restrictive. I can assure the Court that the CIA is not seeking a definition so broad as to include the local electric power company, the supplier of pencils and the public transportation company, as plaintiffs have suggested. Charter legislation concerning U.S. intelligence agencies is currently pending in the Congress. In November 1978, the Special Coordination Commit-

tee of the National Security Council and the President approved and provided to the Senate Select Committee on Intelligence the following definition as part of proposed intelligence charter legislation to be incorporated in Senate Bill S. 2525 of the 95th Congress:

> The term 'intelligence source' means a person, organization, foreign government, material or technical or other means from which foreign intelligence, counterintelligence or counterterrorism intelligence is being, has been or may be derived.

It should be noted that this definition does not represent any attempt to expand the responsibility of the Director of Central Intelligence to protect intelligence sources and methods as set forth in the National Security Act of 1947, *supra*. Rather, the intent is to capture, yet clarify and amplify, that responsibility as it has been traditionally understood within the intelligence community.

7. It is unnecessary to recount at length the details of the origin, duration and demise of the Project known as MKULTRA. Its purpose and history have been publicly discussed with significant candor. Briefly, the Project was concerned with learning the state of the art of behavioral modification at a time when the U.S. Government was concerned about inexplicable behavior of persons behind the "iron curtain" and American prisoners of war who had been subjected to so-called "brainwashing." The purpose was to support research directed at discovering whether certain substances might be capable of influencing human behavior. Institutions involved in the research were reputable and prominent in their particular fields of interest. Many of the researchers were highly respected, even eminent scientists. Initially, the thrust of the Project was defensive. In the case of some few subprojects, however, this defensive counterintelligence orientation became secondary as the possibilities for the use of such techniques to obtain information from enemy agents became apparent. However, insofar as we have been able to determine from available documentation and inquiries directed toward identifying experimental subjects, the institutions and researchers whose identities are at issue in this lawsuit were not involved in that phase of the Project. Throughout the course of the Project, CIA involvement or association with the research was concealed in order to avoid stimulating the interest of hostile countries in the same research areas.

8. It should be recognized that the Project originated in response to a perceived threat to national security. Information was developed for possible exploitation for intelligence or counterintelligence purposes. Extensive measures were taken to insure that CIA interest in the institutions and researchers involved was concealed. Substantive knowledge derived from the Project and the identities of the participating institutions and researchers were considered classified as matters of national security.

9. In 1973 records believed at the time to comprise all the MKULTRA files were destroyed. During the summer of 1977, some previously undiscovered financial documents pertaining to the Project were located. Upon careful review of these records, it was determined that most of the substantive information concerning the results of MKULTRA research, to the extent that such information was contained in these records, did not require continued protection and could be declassified and released. This decision, however, did not by any means affect my continuing responsibility to protect as intelligence sources those institutions or individuals who participated, wittingly or unwittingly, in the MKULTRA research. Such disclosure of previously classified information, while continuing to protect the identities of intelligence sources, is not without precedent. In fact, it is a frequent practice. For instance, during the Cuban missile crisis, President Kennedy decided to release a great deal of sensitive intelligence information concerning Soviet missile installations in Cuba. It was clear, at that time, that the Soviets had to be told publicly that the United States Government had precise information on the extent of the Soviet threat in order to justi-

fy the strong countermeasures then taken by our Government. Nevertheless, the identities of intelligence sources who contributed to our intelligence efforts continued to be protected from disclosure. Similarly, the technical details of the U–2s which contributed to our knowledge at that time were not revealed.

10. If the Government were a party to a contract in which confidentiality were a condition, expressed or implied, the Government could not cavalierly disregard the conditions of the contract. Of greater concern, however, is the pledge of confidentiality which pervades the relationship between the CIA and its intelligence sources. This pledge, expressed or implied, rises above the nature of a contract. It transcends any single Agency-source relationship and is inherently a matter of national security. The ability and willingness of the CIA to protect the identity of intelligence sources is the linchpin that enables the Agency to collect human source intelligence. Project MKULTRA and the sources involved in that Project do not exist in a vacuum. They cannot neatly be set aside and said to bear no relationship to the other ongoing intelligence collection efforts in which the Agency is involved now, or in which it may be involved in the future. Indeed, the willingness to protect old confidences is viewed as a positive indication of the attitude toward continuing acceptance of the responsibility to protect current and future sources.

11. The individuals, organizations and governments with which the Agency must deal are legitimately concerned with and acutely attuned to any signal that the Director of Central Intelligence is unable or unwilling to discharge the responsibility to protect intelligence sources from unauthorized disclosure. Even unwitting sources must be protected not just because disclosure will probably result in the loss of intelligence available from that source, but because any disclosure is perceived by tentatively cooperative sources as an erosion or abnegation of the Director's responsibility. Source protection is an absolute. The concept that it is discretionary, that the Director of Central Intelligence will waive his responsibility as he sees fit, cannot be allowed to flourish. Too many events over the past several years have planted seeds of doubt around the world about the Agency's ability to maintain a confidence. External assaults upon the CIA by those who would deliberately destroy the Agency's effectiveness can be understood by individuals who might be persuaded to cooperate with American intelligence. It can also be understood that in unusual situations, as in the case of MKULTRA, institutions might be revealed as formerly cooperative sources where there is mutual agreement that authorized disclosure be made.[1] But a unilateral breach of confidentiality and trust by the United States Government will be viewed as an arrogant disregard for the lives or safety or reputations of those who have contributed to our intelligence activities. In the alternative, such a breach will be seen as a sign of weakness, of inability to honor commitments. Either way, the result will assuredly be the same. The ability to recruit human intelligence sources will be impaired, if not destroyed. The willingness of those individuals who can contribute positively to the development of enhanced collection techniques, human or technical, will be diminished. The simple facts of any one situation cannot be viewed in a single dimension. In full perspective, what must be appreciated is that the perception of the CIA by active or potential sources is a determinative factor which must always be taken into account.

12. I have attempted in this affidavit to demonstrate why the researchers and the institutions which were involved in the MKULTRA research were intelligence sources. If this is accepted, then certain conclusions must inexorably follow. These conclusions are not altered by the release of the names of certain of the institutions nor by the declassification and release of sub-

---

1. I solicited such agreements from institutions involved in MKULTRA only because I am firmly committed to a course of action which may lead to the identification of any unwitting experimental subjects.

stantive information concerning the Project. Those releases reflected a decision by the CIA that the public interest would be served by public disclosure, but that decision was predicated upon a condition precedent that the consent of the institutions would be first obtained. But those releases do not bear upon the continuing responsibility to protect the identities of the remaining sources. Neither the nature of the Project nor the curiosity of the public can override the obligation of the Director of Central Intelligence to abide by the Congressional mandate to protect intelligence sources which arises from the very nature of the craft of intelligence.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of May 1979.

/s/ STANSFIELD TURNER