John Cary SIMS et al.

v.

**CENTRAL INTELLIGENCE AGENCY
et al., Appellants.**

Nos. 79–2203, 79–2554.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 28, 1980.

Decided Sept. 29, 1980.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants.

Paul Alan Levy, Washington, D. C., with whom David C. Vladeck and Alan B. Morrison, Washington, D. C., were on the brief, for appellees.

Before WRIGHT, Chief Judge, MIKVA, Circuit Judge, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Opinion dissenting in part filed by Chief Judge MARKEY.

**J. SKELLY WRIGHT, Chief Judge:**

This appeal presents two issues concerning the obligations of the Central Intelligence Agency (CIA) under the Freedom of Information Act (FOIA).[1] In response to a citizen request for the names of persons and institutions who conducted scientific and behavioral research under contracts with or funded by the CIA, the Agency asserts two statutory exemptions from the disclosure requirements of the FOIA. Invoking Exemption 3,[2] the Agency claims that the requested material is "specifically exempted from disclosure" by the terms of the National Security Act.[3] The Agency also cites Exemption 6, which shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"[4] The District Court denied the applicability of either exemption to the facts in issue and granted summary judgment to the appellees who requested the documents.[5] In reviewing the District Court's analysis of the issue presented under Exemption 3, we are unable to conclude that the court reached its decision through application of the proper legal standard. We therefore remand the case for additional proceedings. With regard to Exemption 6, the decision of the District Court is affirmed, although, as explained below, we differ with the court's analysis of the issue presented.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Facts

Between 1953 and 1966 the CIA sponsored extensive research concerning "chemical, biological, and radiological materials capable of employment in clandestine opera-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. 5 U.S.C. § 552 (1976).

2. 5 U.S.C. § 552(b)(3) (1976). Exemption 3 authorizes withholding of documents that concern matters "specifically exempted by statute" from the disclosure requirements of the FOIA. *See* text at note 30 *infra* (quoting provision in full).

3. National Security Act of 1947, ch. 343, 61 Stat. 496 (1947) (codified in scattered sections of 5 & 50 U.S.C.). The Agency relies on § 102(d)(3) of the Act, 50 U.S.C. § 403(d)(3) (1976), which authorizes the Director of Central Intelligence to protect "intelligence sources and methods from unauthorized disclosure[.]" The CIA argues that the persons and institutions who conducted the research involved in this case are "intelligence sources" within the meaning of the statute.

4. 5 U.S.C. § 552(b)(6) (1976).

5. The opinion of the District Court, as amended August 13, 1979, is reported at 479 F.Supp. 84 (D. D.C. 1979).

tions to control human behavior."[6] Code-named MKULTRA, the CIA's research program included 149 subprojects undertaken on a contract basis. CIA records document the participation of at least 80 institutions and 185 researchers.[7] Because the CIA funded MKULTRA largely through a front organization, many of the participating individuals and institutions apparently had no knowledge of their involvement with the Agency.[8]

On the basis of available documents, it appears that the CIA originally conceived MKULTRA as a defensive response to possible use by the Soviets and the Chinese of chemical and biological agents as instruments of interrogation and brainwashing.[9] Later, however, the Agency expanded the scope of the program to include efforts to develop chemical and biological agents for use by the CIA. At least some of the subprojects tested chemical and biological substances by administering them to human subjects. Some of the subjects volunteered for their experimental role. Others were unwitting participants, who may never have known what happened to them. At least two persons died as the result of MKULTRA experiments. The extent of possible damage to the health of others remains unknown, because CIA records fail to disclose the identities of all experimental subjects.

The abuses associated with MKULTRA achieved broad publicity as a result of investigations and published reports by an executive commission chaired by Vice President Nelson Rockefeller[10] and a congressional committee led by Senator Frank Church.[11] Nonetheless, the details of the project's history remain mysterious. At the direction of then Director Richard Helms, the CIA destroyed most of its substantive records pertaining to the project in 1973. Investigative efforts therefore depended largely on oral testimony. In 1977, however, the Agency located some 8,000 pages of previously undisclosed documents related to the project.[12] Consisting mostly of fiscal and financial records, the new material had escaped the search of the archivists who conducted the earlier purge. In addition to general descriptions of 149 subprojects, the new documents contained the names of persons and institutions who had contracted to undertake research.

Upon discovery of the project data, CIA Director Stansfield Turner notified the Senate Select Committee on Intelligence, and he testified at a joint hearing of the Select Committee on Intelligence and the Subcommittee on Health and Scientific Research of the Senate Committee on Human Resources. The CIA subsequently provided the Joint Committee first with summary reports and then with copies of the documents themselves. Although the CIA's rec-

6. Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94–755, 94th Cong., 2d Sess., Book I at 389 (1976) (footnote omitted) (hereinafter cited as "Church Committee Final Report").

7. Brief for appellants at 10.

8. Brief for appellants at 10.

9. For an account of MKULTRA research and abuses, *see generally* Church Committee Final Report, *supra* note 6, at 385–422, 471–472, *reprinted in* Addendum to Brief for Appellant at 12–51; Joint Hearings Before the Senate Committee on Intelligence and the Subcommittee on Health and Scientific Research of the Senate Committee on Human Resources, "Project MKULTRA, The CIA's Program of Research in Behavioral Modification," 95th Cong., 1st Sess. (Aug. 3, 1977) (hereinafter cited as "Joint Hear-

ings"); Report to the President by the Commission on CIA Activities Within the United States 226–228 (1975) (hereinafter cited as "Rockefeller Commission Report").

10. The Rockefeller Commission Report, *supra* note 9, was completed in 1975.

11. The Church Committee Final Report, *supra* note 6, was compiled prior to the discovery by the CIA of the documents that are the subject of the present FOIA request. Those documents were, however, made available to the Joint Senate Committee comprised of the Senate Select Committee on Intelligence and the Subcommittee on Health and Scientific Research of the Senate Committee on Human Resources. *See* Joint Hearings, *supra* note 9.

12. Brief for appellants at 12.

ords listed participating researchers and institutions, Admiral Turner requested that the Committee treat the names as confidential. The Committee has honored this request.

### B. FOIA Request and Litigation

In a letter dated August 22, 1977, following the conclusion of congressional hearings, John C. Sims and Dr. Sidney M. Wolfe—respectively an attorney and a physician employed by the Nader group Public Citizen—filed a request under the Freedom of Information Act for a list of the names of institutions and researchers who had conducted research under the MKULTRA program, as revealed in any existing MKULTRA documents.[13] According to submissions filed with the court by the CIA, the documents within the scope of the appellees' request contain a total of 265 names: the names of 80 institutions and 185 individual researchers. Upon receipt of the document request, the CIA contacted each of the 80 institutions to ask if they would consent to disclosure of their identities. The Agency made no parallel effort to communicate with the individual researchers. Of the 80 institutions, 59 agreed to disclosure. Their names were revealed to appellees on June 13, 1978. The Agency has also permitted appellees to examine the surviving financial records for the MKULTRA subprojects undertaken by the other persons and institutions, but with their names deleted. In other words, the CIA continues to withhold the names of the 21 research institutions that declined to authorize release of their identities as well as the names of all of the 185 individual researchers listed in MKULTRA files. Dissatisfied with

the extent of the information provided to them, appellees brought this FOIA action on November 30, 1978.

In a memorandum opinion dated April 12, 1979 [14] the District Court held that the institutions and researchers did not, as asserted by the CIA, qualify for withholding under Exemption 3 because they did not constitute "intelligence sources" within the meaning of 50 U.S.C. § 403(d)(3). With regard to the Exemption 6 argument, the court requested that the parties submit supplemental memoranda on the relevance of possible express or implied promises by the CIA to maintain the confidentiality of the researchers whose work it had funded.[15] The court also asked the CIA to draft letters to the researchers and institutions soliciting their understandings of Agency obligations to maintain secrecy.[16] On May 14, 1979 the CIA submitted a further memorandum, an affidavit by Admiral Turner,[17] and a draft of a form letter suitable for mailing to individual researchers. But the Agency declined to assert reliance on a contract theory as its basis for withholding, and it reargued its position that the involved institutions and researchers should be considered "intelligence sources" as a matter of law. In an opinion of August 7, 1979 Judge Oberdorfer rejected both defenses.[18] The court adhered to its prior holding that the institutions and researchers did not constitute "intelligence sources" because the Agency had not shown that "its decision to treat the MK-ULTRA institutions and researchers as 'intelligence sources' under § 403(d)(3) is not an overbroad application of the term, too susceptible to administrative discretion to pass muster under [FOIA Exemption] (b)(3)." [19] Regarding Exemp-

---

13. Although the FOIA imposes no burden of justification, appellees Sims and Wolfe have argued that only by identifying and approaching individual researchers would it be possible to discover information of great public interest: the scope of MKULTRA experimentation, the substantive findings of the research, the side effects of various drugs, and the identities of experimental subjects. Brief for appellees at 26-28.

14. The opinion is printed in the Appendix (App.) at 81-85.

15. App. 84.

16. Id.

17. Reprinted in App. at 88 97.

18. Sims v. CIA, 479 F.Supp. 84 (D. D.C. 1979) (as amended Aug. 13, 1979).

19. Id. at 87.

tion 6, the court determined that it could not accept the position of the Agency without additional information as to whether "any researcher had any reasonable expectation that his or her participation would be anonymous, as to whether any researcher has any other privacy interests which might be compromised by disclosure * * * or whether any researcher has any other objection or reason for objection to disclosure of his or her name."[20] Judge Oberdorfer again invited the CIA to communicate with the individual researchers and apprise the court of their responses by October 1, 1979. The court also gave the Agency additional time to reconsider its decision not to rely on Exemption 1 to the FOIA, which authorizes withholding of documents that are properly classified in order to protect national security interests in defense or foreign policy.[21] The CIA chose not to pursue the suggestions of the District Court. The Agency adhered to its view that its Exemption 6 claim required no communication with the individual researchers, and it filed no papers asserting that the names in issue could properly be classified to protect the national security under Exemption 1.[22] A final judgment ordering disclosure of the researchers' names was entered on November 30, 1979.[23] This appeal ensued.

## II. FREEDOM OF INFORMATION ACT

The Freedom of Information Act, under which this case arises, prescribes with unmistakable clarity the role of the courts in evaluating agency claims of exemption. The basic policy of the Act is to compel disclosure. The burden is always on the agency to support any claim of a right to withhold, 5 U.S.C. § 552(a)(3) (1976), and the courts are authorized to undertake *de novo* review of agency constructions of applicable statutes and of agency determinations that particular records fall within exemption classifications. *Id.*[24]

---

**20.** *Id.* at 89.

**21.** Exemption 1, 5 U.S.C. § 552(b)(1) (1976), immunizes from compulsory disclosure matters that are:

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]

Executive Order 12065, 43 Fed.Reg. 28949 (July 3, 1978), currently permits classification of information within three categories:

1-102. "Top Secret" shall be applied only to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security.

1-103. "Secret" shall be applied only to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security.

1-104. "Confidential" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security.

*Id.* at 28950, §§ 1-102–1-104. The court's invitation to the CIA to cite Exemption 1 could scarcely have been more explicit:

The Court also notes that the policy objectives which concern the Director might very well be accommodated by classifying the lists of names of institutions and researchers pursuant to Executive Order 12065, so that the lists would be exempt from disclosure by 5 U.S.C. § 552(b)(1). In fact, the lists were once so classified, but the defendant has since elected to declassify them so that they are not now exempt under (b)(1). Nothing in the Court's ruling that (b)(3) is inapplicable to the lists here at issue is intended to foreclose (or approve) new classification of the lists and resort to section (b)(1) in order to protect any commitment to anonymity made by defendants to any institution or researchers. The effective date of the accompanying order has been set forward to October 1, 1979 in order to permit the defendant to reexamine and act on the possibility of classifying the names of institutions and researchers which would otherwise be disclosable and to amend the motion and opposition to invoke (b)(1), if it should elect to do so.

*Sims v. CIA, supra* note 18, 479 F.Supp. at 88 (footnote omitted).

**22.** Defendant's Response to Plaintiffs' Motion for Issuance of a Final Order, App. at 113, 114–115 (Nov. 27, 1979).

**23.** *Reprinted in* App. at 117.

**24.** Courts were given authority to review *de novo* any denial of access "in order that the ultimate decision as to the propriety of the agency's action is made by the court and [to] prevent [review] from becoming meaningless judicial sanctioning of agency discretion." S. Rep. No. 813, 89th Cong., 1st Sess. 8 (1965).

In weighing claims asserted by an agency as intimately connected with national security as the CIA, courts may feel a natural disposition to proceed with some deference. Even in this delicate context, however, Congress has indicated that the basic FOIA policy of maximum disclosure must be enforced in appropriate cases by the courts.[25]

Two amendments to the Freedom of Information Act, both adopted in response to deferential decisions by the Supreme Court, clearly signal congressional intent concerning the judicial role. The first amendment responded to *EPA v. Mink*, 410 U.S. 73, 81–84, 93 S.Ct. 827, 833–34, 35 L.Ed.2d 119 (1973), in which the Court affirmed nondisclosure under Exemption 1, the "national security" exemption to the FOIA, solely on the basis of an agency affidavit. Exemption 1 then covered matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy,"[26] and the Court construed the provision as withholding judicial authority to test the propriety of executive classifications. Within two years Congress reversed *Mink* by legislation. As modified, Exemption 1 now requires that, in order to qualify for the exemption, information must "in fact [be] properly classified pursuant to * * * Executive order."[27] Its terms thus demand judicial determination of the relation of various documents to the national security and, accordingly, review of agency records in order for courts to determine the propriety of classification.[28]

Congress moved similarly to nullify the decision rendered by the Supreme Court in *FAA Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). Exemption 3 originally applied to any "matters specifically exempted from disclosure by statute."[29] After the *Robertson* Court held that this language encompassed a statute granting broad agency discretion to determine whether information should be withheld, Congress, concerned that the Court's construction threatened the purposes of the FOIA, quickly amended the Act. Exemption 3 now authorizes nondisclosure of matters "specifically exempted from disclosure by statute" only where the exempting provision either "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]"[30]

In the case at bar the CIA rests its claim of a right to withhold, as it must, on specific exemptions provided by the FOIA. The CIA is not exempt from the FOIA. Congress has determined that the requirements of national security are satisfied by the specific structure of exemptions created by statute.

Within the statutory framework the CIA is entitled to rely on any or all of the nine FOIA exemptions. In previous cases brought before this court the Agency has relied most frequently on Exemption 1, pertaining to matters classified in order to protect the national security.[31] But the CIA is not limited to that exemption, or required to invoke it in a particular case. It has chosen not to invoke it in this one.

Denial of protection claimed for documents under one exemption does not, of course, mean that the same or similar material would not be exempt from disclosure if another exemption were invoked and its procedures properly satisfied. But the burden is always on the agency to justify non-

---

**25.** Congress specifically addressed this issue when it overrode President Ford's veto to pass the 1974 Amendment authorizing *de novo* review of agency classification decisions in national security cases. The legislative history of this provision, which became 5 U.S.C. § 552(b)(1), is extensively rehearsed in *Ray v. Turner*, 587 F.2d 1187, 1206–1214 (D.C. Cir. 1978) (Wright, C. J., concurring).

**26.** 5 U.S.C. § 552(b)(1) (1970).

**27.** 5 U.S.C. § 552(b)(1) (1976).

**28.** 5 U.S.C. § 552(a)(4)(B) (1976).

**29.** 5 U.S.C. § 552(b)(3) (1970).

**30.** 5 U.S.C. § 552(b)(3) (1976).

**31.** *See, e. g., Ray v. Turner, supra* note 25; *Phillippi v. CIA*, 546 F.2d 1109 (D.C. Cir. 1976).

disclosure under the terms of the specific exemption or exemptions that it claims. In this case the CIA has based its claim on two exemptions from among the nine: the Exemption 3 exception for matters specifically protected by statute and the Exemption 6 shield for personnel and similar files.

## III. EXEMPTION 3

### A. *Issue Presented*

This court has held consistently that Section 102(d)(3) of the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1976), which authorizes the Director of Central Intelligence to protect "intelligence sources and methods" from unauthorized disclosure, "establishes particular criteria for withholding or refers to particular types of matters to be withheld" and thus qualifies as a withholding statute under Exemption 3. *E.g.,* *Goland v. CIA,* 607 F.2d 339, 350 (D.C. Cir. 1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Marks v. CIA,* 590 F.2d 997 (D.C. Cir. 1978). Our Section 403(d)(3) cases have mostly involved questions of the degree of factual specificity a CIA affidavit must attain in order to enable a court to determine that particular documents come within its terms. *E.g., Goland v. CIA, supra,* 607 F.2d at 351; *Ray v. Turner,* 587 F.2d 1187, 1196–1197 (D.C. Cir. 1978). Other cases have considered the conditions under which a court should undertake *de novo* review of the accuracy of facts alleged in a CIA affidavit claiming a right to withhold under Exemption 3. *E.g., Ray v. Turner, supra,* 387 F.2d at 1194–1195; *Weissman v. CIA,* 565 F.2d 692 (D.C. Cir. 1977). Never, however, have we undertaken expressly to construe the term "intelligence sources and methods." We have simply assumed the phrase to have a plain meaning. The question of statutory construction presented by this case is therefore one of first impression, in which there is little precedent to guide us. We must determine, or provide guidelines for determining, whether the researchers and institu-

tions whose names the CIA seeks to withhold constitute "intelligence sources" within the meaning of Section 403(d)(3).[32]

Although we have never before been asked to construe this term, our cases make clear the guidelines within which construction of exempting statutes under Exemption 3 must proceed. "The words of the statute and the relevant precedents establish the kinds of matters that are exempt and any necessary procedural steps that are required for exemption." *Ray v. Turner, supra,* 587 F.2d at 1214 (Wright, C.J., concurring). Moreover, we must take care that terms susceptible of expansive interpretation are construed "with sensitivity to the 'hazard[s] that Congress foresaw.'" *Founding Church of Scientology v. Nat'l Security Agency,* 610 F.2d 824, 829 (D.C. Cir. 1979) (brackets in original), *quoting American Jewish Congress v. Kreps,* 574 F.2d 624, 629 (D.C. Cir. 1978). In order to carry out "Congress' intent to close the loophole created in *Robertson,*" *Founding Church of Scientology v. Nat'l Security Agency, supra,* 610 F.2d at 829, *quoting Ray v. Turner, supra,* 587 F.2d at 1220 (Wright, C.J., concurring), courts must guard against expansion of the "particular types of matters" Congress has exempted from disclosure in a way that would create broad agency discretion of the very type that Congress sought to eliminate.

Because the term "intelligence methods and sources" appears in the text of the National Security Act, it is appropriate for us to begin our analysis with the construction proposed by the CIA, an agency chartered by that statute and charged with major responsibility for its administration. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *Skidmore v. Swift,* 323 U.S. 134, 138–140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). But we must not shrink from the responsibility vested in us by Congress. The question presented is one of law reserved ultimately to our determination.

---

**32.** The Agency makes no claim that any of the information here in issue must be withheld in

order to protect intelligence "methods."

## B. CIA Interpretation

On this appeal the CIA argues for a standard under which the term "intelligence source" is defined to mean "any individual, entity or medium that is engaged to provide, or in fact provides, the CIA with substantive information having a rational relation to the nation's external national security."[33] The Agency candidly concedes that this is a broad definition, which would apply even to periodicals—including *Pravda* and the *New York Times*—from which it culls information that informs its view of foreign nations and their policy intentions.[34]

The CIA supports its construction of the National Security Act primarily through an appeal to policy considerations.[35] The Agency argues that the complexity of its mission makes necessary an expansive definition broad enough to encompass those who give assistance to clandestine agents and those who develop intelligence devices and techniques on which agents rely, even if they do not themselves provide the CIA directly with information about foreign governments. Noting that information about mind-altering drugs, like all research leading to development of investigative devices and technology, is rationally related to national security and threats thereto, the Agency worries that scientists may hesitate to undertake research for the Agency in the future, or that exposure of researchers' identities might expose them to foreign surveillance or interference. The Agency also argues that its responsibilities include analysis as well as collection of secret information, and that it should not, consistent with the demands of national security, be compelled to make public the names of those persons and even those publications that it consults. Finally, the Agency insists that a standard weakening its power to withhold information in one area of its activities may cause persons associated with it in other areas to lose confidence in the Agency's promises and hence to break contact with it.

## C. The Statutory Context

■ In assessing the arguments proffered by the CIA we must be mindful that the "unmistakable thrust" of the *Robertson* amendment to the FOIA "is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch," *American Jewish Congress v. Kreps, supra,* 574 F.2d at 628 & n.33; *see Founding Church of Scientology v. Nat'l Security Agency, supra,* 610 F.2d at 827–829, and that it is the responsibility of the courts under the FOIA "to insure that agencies do not impermissibly expand by unreviewed interpretations the 'particular types of matters' Congress has exempted from disclosure," *Ray v. Turner, supra,* 587 F.2d at 1221 (Wright, C.J., concurring). Taking seriously the responsibilities vested in us by the Congress, we are unable to agree with the CIA that Congress intended the term "intelligence sources" to refer so broadly. Although the legislative history is sparse, the mosaic of relevant statutory enactments reflects Congress' sensitivity to the need for discrimination in identifying particular types of matters exempted from disclosure. This sensitivity can be seen, not only in the Freedom of Information Act,[36] but also in the relationship between the National Security Act[37] and the Central Intelligence Agency Act[38]—a relationship that belies the suggestion that Congress intended the term "intelligence sources" to receive an elastic construction in order to preserve vital secrets that would otherwise lack protection.

The principal purpose of Congress in enacting the National Security Act of 1947, in which Section 403(d)(3) appears, was to uni-

---

**33.** Brief for appellants at 24.

**34.** *See* reply brief for appellants at 5.

**35.** *See generally* brief for appellants at 25–28; reply brief for appellants at 3–9.

**36.** 5 U.S.C. § 552 (1976).

**37.** National Security Act of 1947, ch. 343, 61 Stat. 496 (1947) (codified in scattered sections of 5 & 50 U.S.C.).

**38.** Central Intelligence Agency Act of 1949, ch. 227, § 1, 63 Stat. 208 (1949) (codified at 50 U.S.C. §§ 403a–403j (1976).

fy the armed forces under a single Secretary of Defense. As part of an overall effort "to provide for the establishment of integrated policies and procedures for the departments, agencies, and functions of the Government relating to national security[,]" [39] the Act created the National Security Council and the Central Intelligence Agency. The statute vests in the CIA responsibility for correlating and evaluating intelligence generated, not only through its own facilities, but also through those of other government agencies. It then states, without further elucidation or definition of terms, that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure[.]" [40]

In the context, the phrase "intelligence sources and methods" is ambiguous. It would support the CIA's construction that the identity of anyone providing information rationally related to national security is *ipso facto* protected. Yet the Act's underlying purpose of safeguarding national security gives equal plausibility to the inference that persons are intended to be regarded as protected intelligence sources only if nondisclosure of their identities would itself be justifiable on national security grounds—the construction probably most compatible with the position of appellees on this appeal.

Against this background, the Central Intelligence Agency Act of 1949, and particularly Section 7 of that Act, 50 U.S.C. § 403g (1976), assumes some significance. As it appears in the United States Code, Section 403g, "in order further to implement the [protection of intelligence sources] proviso of section 403(d)(3)," recites in greater detail specific kinds of information that are statutorily exempt from disclosure: "[T]he Agency shall be exempted from the provisions * * * of any * * * law[s] which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency[.]" [41]

We believe the specificity of Section 403g is important to this case for two reasons. First, it suggests that the parade of horribles feared by the CIA if its definition is not accepted would simply not occur. Section 403g provides specific protection for most of the CIA activities and contractual relationships about which the Agency has expressed greatest concern. This conclusion is strengthened by the fact that the Agency may always—though it has not chosen to do so in this case—invoke Exemption 1 to justify nondisclosure of any material it properly decides to classify in order to pro-

---

**39.** National Security Act of 1947 § 2, 50 U.S.C. § 401 (1976).

**40.** National Security Act § 102(d), 50 U.S.C. § 403(d) (1976), recites the powers and duties of the CIA as follows:

> For the purpose of coordinating the intelligence activities of the several Government departments and agencies in the interest of national security, it shall be the duty of the Agency, under the direction of the National Security Council—
>
> (1) to advise the National Security Council in matters concerning such intelligence activities of the Government departments and agencies as relate to national security;
>
> (2) to make recommendations to the National Security Council for the coordination of such intelligence activities of the departments and agencies of the Government as relate to the national security;
>
> (3) to correlate and evaluate intelligence relating to the national security, and provide for the appropriate dissemination of such intelligence within the Government using

where appropriate existing agencies and facilities: *Provided,* That the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions: *Provided further,* That the departments and other agencies of the Government shall continue to collect, evaluate, correlate, and disseminate departmental intelligence: *And provided further,* That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure;

> (4) to perform, for the benefit of the existing intelligence agencies, such additional services of common concern as the National Security Council determines can be more efficiently accomplished centrally;
>
> (5) to perform such other functions and duties related to intelligence affecting the national security as the National Security Council may from time to time direct.

**41.** 50 U.S.C. § 403g (1976).

tect a specific interest in national security. Second, Section 403g evinces a congressional awareness that Section 403(d)(3) as originally written is not and was not intended to be endlessly expansive. Congress recognized that Section 403(d)(3) would require construction and interpretation limiting executive discretion to withhold; otherwise it would have felt no need to "implement" the original proviso by listing the specific matters exempted from disclosure under Section 403g.

As a result of congressional action the meaning of "intelligence sources" in Section 403(d)(3) unambiguously encompasses all classes of persons and entities within the listing of Section 403g. In order to preserve, yet also to limit, the range of matters additionally protected, we must look, in the absence of clear legislative history, to the congressionally mandated and valid purposes of the Central Intelligence Agency, whose effective functioning Congress sought in Section 403(d)(3) to promote.

In chartering the CIA Congress set out, not to protect secrecy as an end in itself, but to provide for effective collection and analysis of foreign intelligence pertinent to concerns of national security. Secrecy seems to have been a concern only insofar as it was pertinent to protection of the national security. Analysis should therefore focus on the practical necessity of secrecy. In order to avoid an overbroad discretionary standard, see *Founding Church of Scientology v. Nat'l Security Agency, supra,* 610 F.2d at 829, yet at the same time to protect the underlying concerns of Congress, Section 403(d)(3) must be interpreted in functional terms: an "intelligence source" is a person or institution that provides, has provided, or has been engaged to provide the CIA with information of a kind the Agency needs to perform its intelligence function effectively, yet could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it.

### D. *Issues on Remand*

Application of this standard will entail a number of complex determinations for which this case must be remanded to the District Court. Conceptually distinct, yet implicating similar if not identical factual concerns, these include definition of the class or "kind" of information involved and assessment of the likelihood that disclosure would undermine CIA access to information of that kind.

■ The inquiries requisite to these determinations will be heavily factual, and, as an opinion by Judge Wilkey recently emphasized, courts should accord "substantial weight" to the factual allegations of the CIA in the area of national security. *Halperin v. CIA,* 629 F.2d 144, 148 (D.C. Cir. 1980). Congress intended no less, but also no more.

In amending the Freedom of Information Act to reverse the *Mink* case and to provide for *de novo* review in the District Courts of agency decisions to classify information under the national security exemption, Congress carefully considered the weight to which agency determinations were entitled. One proposal called for agency classifications in the national security context to be subject only to minimal judicial scrutiny: courts would be limited to determining whether there was a "reasonable basis" for the agency decision to withhold a document.[42] Congress explicitly rejected this position.[43] *De novo* review was provided in every case.

---

42. The bill reported by the Senate Judiciary Committee would have prescribed this standard. S. 2543, 93d Cong., 2d Sess. § (b)(2), *reprinted in* Staffs of Senate Committee on the Judiciary and House Committee on Government Operations, Freedom of Information Act and Amendments of 1974 (Pub. L. 93–502), Source Book: Legislative History, Texts, and Other Documents, at 282 (Committee Print 1975) (hereinafter cited as "Source Book").

43. The "reasonable basis" language was deleted from the Senate bill pursuant to an amendment introduced by Senator Muskie. *See* 120 Cong.Rec. 17022–17032 (1974). Senator Ervin supported the Amendment with the following remarks:

The [unamended] bill provides that a court cannot reverse an agency even though it finds it was wrong in classifying the document as being one affecting national security,

Congressional intent emerges clearly from the report of the Conference Committee to which the "substantial weight" standard can be traced.[44] The report recognized that "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public exposure of a particular classified record." Accordingly, it was "expect[ed] that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record."[45] But the Conference Committee reiterated its intention to authorize *de novo* judicial decisions. And it specified that "[t]he burden remains on the Government under this law."[46]

As the *Halperin* case illustrates, the "substantial weight" formula is most likely to assist the Government in meeting its burden when answering questions about the future effects of document disclosure on national security. As the court stated, a predictive statement "will always be speculative to some extent[.]" *Halperin v. CIA, supra,* 629 F.2d at 149. In holding the Government to the burden of justification imposed on it by Congress, courts should not require the impossible. On the other hand, there are other inquiries in which the CIA must stand on essentially the same footing as any other litigant. For example, final resolution of FOIA cases typically demands an application of law to fact. Once the facts are found, it may remain to be determined whether they fall within the exempting ambit of one or another statute. Construction of statutes is an area of special judicial competence. Agency interpretations should not, in this context, receive any more "substantial weight" than their intrinsic merit commands.

The *Halperin* case is again illustrative. One section of the court's opinion settled the narrow point of law that private attorneys who work under contract for the CIA in matters pertaining to necessarily clandestine activities constitute "personnel employed by the Agency" whose names are exempt from disclosure under Exemption 3 and Section 403g. *See id.,* 629 F.2d at 151. Before reaching this narrow legal conclusion the court, in other parts of its opinion, accorded substantial weight to the Agency's assertion that disclosure of the names of such attorneys would lead to exposure of intelligence sources. *Id.,* 629 F.2d at 147-150. But the court indicated no reliance on the Agency in determining the legal issue. It would be inappropriate for a court to abdicate any part of its responsibility to decide whether a factual showing of the likely consequences of disclosure should suffice to bring a particular document within the protective intent of a pertinent statute.

## IV. EXEMPTION 6

■ Exemption 6 to the Freedom of Information Act authorizes withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"[47] In order for an agency

---

unless it further finds that the agency was not only wrong, but also unreasonably wrong.

\*    \*    \*    \*    \*    \*

Why not let the judge determine that question, because national security is information that affects national defense and our dealings with foreign countries? That is all it amounts to.

If a judge does not have enough sense to make that kind of judgment, he ought not to be a judge \* \* \*.

*Id.* at 17030.

**44.** `S. Rep. No. 93–1200, 93d Cong., 2d Sess. 9 (1974). The Conference Committee explicitly rejected a proposal by President Ford to return

to the "reasonable basis" standard of review. *See* letter from President Gerald R. Ford to Honorable William S. Moorehead, August 20, 1974, *reprinted in* Source Book, *supra* note 42, at 380.

**45.** S. Rep. No. 93–1200, *supra* note 44, at 12.

**46.** *Id.* at 9.

**47.** 5 U.S.C. § 552(b)(6) (1976). The CIA invokes Exemption 6 to protect the names of individual researchers, but makes no claim that the names of the institutions participating in MKULTRA could be withheld on that basis. Exemption 6 is applicable only to individuals.

to justify nondisclosure under this provision, the Government must carry each of three burdens. First, the agency must establish that the requested file is in fact appropriately classified as "personnel," "medical," or "similar." Second, it must demonstrate that release of the information would violate substantial privacy interests of the person or persons involved. Finally, but only if the first two burdens are met, the statute prescribes a balancing test on which the agency must also prevail. In order to resist disclosure, the agency must show that the substantial interest in personal privacy is not outweighed by the public interest in disclosure. *Dep't of Air Force v. Rose*, 425 U.S. 352, 373, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976); *Getman v. NLRB*, 450 F.2d 670, 674–677 (D.C. Cir. 1971).

Although finding that a list of names of individual researchers comprised "similar files" under Exemption 6, the District Court rejected the Government's claimed right to withhold by determining that the CIA had failed to satisfy the third requirement of nondisclosure.[48] The court noted that the Agency had not supplied information the court deemed essential to accurate assessment of the privacy interests involved.[49] And without such information the Government could not prevail on the balancing test.

After the District Court rendered its decision in this case Judge Robinson's opinion for this court in *Board of Trade of City of Chicago v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 396–400 (D.C.Cir. 1980), has analyzed and clarified the features that a document must possess to meet the threshold, definitional requirements of a "similar" file under Exemption 6. Had Judge Oberdorfer had the benefit of this opinion, he might well have concluded, as we do, that the CIA records requested in this case cannot be considered "personnel and medical files [or] similar files" eligible for withholding.

Exemption 6 was intended by Congress to protect individuals from public disclosure of "intimate details of their lives, whether the disclosure be of personnel files, medical files, or other similar files." *Board of Trade of City of Chicago v. Commodity Futures Trading Comm'n, supra*, 627 F.2d at 399, *quoting Rural Housing Alliance v. U.S. Dep't of Agriculture*, 498 F.2d 73, 77 (D.C. Cir. 1974); *see Robles v. EPA,* 484 F.2d 843, 845 (4th Cir. 1973). Although the opinion in *Rural Housing* stated that the exemption "is phrased broadly to protect individuals from a wide range of embarrassing disclosures," 498 F.2d at 77, the context makes clear the court's recognition that the disclosures with which the statute is concerned are those involving matters of an

*Nat'l Parks and Conservation Ass'n v. Kleppe,* 547 F.2d 673, 685 n.44 (D.C. Cir. 1976); *Robertson v. Dep't of Defense*, 402 F.Supp. 1342, 1348 (D. D.C. 1975).

**48.** Any ambiguity in the court's opinion arises because the second and third inquiries are so intimately connected. Although the court's conclusion that the public interest in disclosure outweighs the privacy interest in nondisclosure clearly assumes some weighing of the relevant privacy interest, it is unclear whether the District Court in this case decided the second issue—whether there was an invasion of personal privacy sufficiently deep and severe to qualify under any circumstances as "clearly unwarranted." The court might merely have assumed the existence of such an interest *arguendo* and then found that interest to be overridden. *See Sims v. CIA, supra* note 18, 479 F.Supp. at 89.

**49.** Although the District Court held that the CIA had not provided adequate factual support

for its claim to invoke Exemption 6, it invited the CIA to communicate with individual researchers to elicit "additional information as to whether any researcher has any reasonable expectation that his or her participation would be anonymous, as to whether any researcher has any other privacy interests which might be compromised by disclosure of participation in the project or whether any researcher has any other objection or reason for objection to disclosure of his or her name." *Id.* Believing it possible that the CIA might somehow justify its Exemption 6 claim on the basis of facts developed from the suggested communications, the District Court deferred the effective date of its order to disclose for nearly two months to give the CIA time to elicit more facts and develop legal arguments based thereon. The CIA, however, chose not to communicate with the researchers. It merely repeated the legal theories urged earlier.

**574**

intimate personal nature. Because of its intimate personal nature, information regarding "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, reputation, and so on" falls within the ambit of Exemption 6. *Id.* By contrast, as Judge Robinson stated in the *Chicago Board of Trade* case, 627 F.2d at 399, the decisions of this court have established that information connected with professional relationships does not qualify for the exemption.

In *Getman v. NLRB, supra,* for example, we ordered disclosure of a list of names and addresses of persons eligible to vote in union representation elections, despite assertions that their privacy would be compromised.[50] Although holding explicitly only that release would not constitute a clearly unwarranted invasion of privacy, we strongly suggested that the requested lists of names and addresses failed to qualify as "similar files." "[T]he real thrust of Exemption (6)," we wrote, "is to guard against unnecessary disclosure of files of such agencies as the Veterans Administration or the Welfare Department or Selective Service or Bureau of Prisons * * *. The giving of names and addresses is a very much lower degree of disclosure[.]" 450 F.2d at 675.

*Board of Trade of City of Chicago v. Commodity Futures Trading Comm'n, supra,* provides more direct authority. That case arose from an investigation by the Commodity Futures Trading Commission of the Board of Trade's contract to operate a commodity futures market in Chicago.[51] As part of its inquiry into the plywood futures contract the Commission solicited criticisms and suggestions from persons trading under the contract, at least some of whom responded with the understanding that their identities would be kept confidential. The Commission therefore asked the Board to respond to complaints and suggestions that it identified only as issuing from "trade sources." Arguing that it could not assess the criticisms and suggestions without knowing their sources, the Board refused to respond until the names in question were released. The Commission still declined to reveal the names of its informants, and an FOIA action ensued. In an opinion by Judge Robinson this court concluded that Exemption 6 did not apply to the challenged records, due to their essentially business nature. There was present in the case a privacy interest, implicated "insofar as release of identifying details would expose the occupations of these sources, their relationship to the Board, and how they perceive the workings of the market enterprise from which they derive at least part of their livelihood." 627 F.2d at 399. "But," the court continued, "the fact remains that the withheld information associates these individuals with business of the Board, and not with any aspect of their personal lives. The interest in nondisclosure thus asserted is not in continued privacy of personal matters, but in anonymity * * * on purely commercial matters." *Id.* at 399-400.

**50.** In *Getman* we held that the law professors conducting an NLRB voting study were entitled to compel the NLRB to provide them with the names and addresses of employees eligible to vote in certain union elections. Because the avowed purpose of the professors was to telephone selected employees and ask them to submit to interviews, the court recognized that "disclosure does involve some invasion of privacy[.]" *Getman v. NLRB,* 450 F.2d 670, 675 (D.C. Cir. 1971). But we stressed that disclosure of the business connection between union and employee bared no intimately personal facts and left "any disclosure of information [that is] more personal * * * wholly consensual and within the control of the employee." *Id.*

**51.** The Commodity Futures Trading Commission is an independent regulatory agency created by the Commodity Futures Trading Act of 1974. Commodity Exchange Act, 42 Stat. 998 (1922), as amended by the Commodity Futures Trading Commission Act of 1974, Pub. L. No.93-463, 88 Stat. 1389, 7 U.S.C. § 1 *et seq.* (1976). To function lawfully as a futures contract market, a Board of Trade must meet certain standards as well as comply with Commission guidelines. The Commission periodically conducts investigations to determine whether all requirements are being satisfied.

We adhere to the analysis of Exemption 6 developed in the *Chicago Board of Trade* case. Exemption 6 was developed to protect intimate details of personal and family life, not business judgments and relationships. Surely it was not intended to shield matters of such clear public concern as the names of those entering into contracts with the federal government.

To support its claim to invoke Exemption 6 the CIA relies principally on *Dep't of Air Force v. Rose, supra,* a case in which the Supreme Court ordered release of files summarizing disciplinary proceedings against cadets at the Air Force Academy but approved deletion of individual names therein. In holding that records of disciplinary proceedings triggered the "similar files" provision of Exemption 6, the Court noted, among other factors, the possibility of "lifelong embarrassment" ensuing from disclosure. The CIA argues that the possibility of embarrassment to CIA researchers brings the records requested in the present case within the holding of *Rose.* We cannot agree.

Although the threat of embarrassment was a significant factor in *Rose, see* 425 U.S. at 376–377, 96 S.Ct. 1592 at 1606–07, 48 L.Ed.2d 11, the Court was also at pains to note that the records of the panels at the Air Force Academy involved judgments about matters that are intimate and personal in the highest degree—judgments of ethical propriety and individual honor. There was no implication that "embarrassment" alone would have sufficed to justify nondisclosure. Clearly Exemption 6 could not be invoked, under *Rose,* to protect the concerns of a contractor who would be embarrassed by disclosure of his responsibility for shoddy work. No more should it reach the names of those embarrassed by the nature of contract work they have undertaken.[52]

Moreover, even if we were to reach the stage of weighing the privacy interest in nondisclosure and ultimately that of balanc-

ing,[53] we would be compelled to agree with the District Court that the CIA has failed to justify nondisclosure. Eschewing suggestions by the District Court that it communicate with the individual researchers, the Agency has failed to particularize their objections to disclosure or to establish the likely consequences of disclosure in individual cases. In the absence of a more detailed and conclusive factual showing, we could hardly find that the Agency had shown an invasion of personal privacy so deep and severe as to count as "clearly unwarranted" when measured against the countervailing public interest in full disclosure. And in applying a statute whose language "instructs the court to tilt the balance in favor of disclosure," *Getman v. NLRB, supra,* 450 F.2d at 674, we have to accord substantial weight to the claims of possible public profit. These include possible increases in public knowledge of specific experimental projects and possible identification of additional victims of drug testing.

## V. CONCLUSION

For the reasons stated herein, the judgment of the District Court must be vacated and the case remanded for further action not inconsistent with this opinion.

*Vacated and remanded.*

MARKEY, Chief Judge, dissenting in part:

I join Chief Judge Wright's typically lucid opinion for the court, dissenting, with utmost respect, only from the conclusion that a remand in respect of Exemption 3 is either necessary or advisable.

Three years is enough. Plaintiffs filed their request in August, 1977. After more than a year of delay, they filed suit in November, 1978. After a year of litigation, they prevailed in 1979. It is now September, 1980. The information sought is at

---

52. The fact that an embarrassing disclosure might have costly business consequences was implicitly held to be irrelevent in *Board of Trade of City of Chicago v. Commodity Futures*

*Trading Comm'n,* 627 F.2d 392, 400 (D.C. Cir. 1980).

53. *See* text following note 47 *supra.*

least 14 years old. Absent some imperative, plaintiffs should not be forced to return for further litigation in the district court.

I agree that courts, while shirking none of their statutory responsibilities under FOIA, should approach with sheathed swords when our nation's security is involved. The CIA is not the EPA or the FAA. Here, however, the Agency has specifically declined to refuse disclosure on national security grounds.

Indeed, the Agency has declined and disdained the deference–in–depth shown it by the district court. It has elected to confront the courts with a broad interpretation of Exemption 3, declining the district court's grant of additional time to consider Exemption 1, to assert a contract theory, to contact the researchers, and to show facts indicating that its interpretation of "intelligence sources" as here applied is not so overbroad as to amount to untrammeled agency discretion. Before us, the Agency presents policy questions more properly presented to the Congress. The resulting impression is one of *noblesse oblige.* It does the Agency no injustice to remark that one who appears to have thrown down a gauntlet should not be surprised when it appears to have been picked up. The Agency's implicit invitation to supply a usable definition of "intelligence source," as that phrase is employed in Section 403(d)(3), has been well met in Chief Judge Wright's opinion.

The clarity and applicability of that definition to the facts of record, coupled with the conduct of the Agency, prompt my view that remand is unnecessary and inadvisable.

It is true that neither the Agency in 1977, nor the district court in 1978, had the present definition available. Nonetheless, the differences between the definition here established and that employed by the Agency are not, in light of the record, such as to compel remand.

The present definition is broader in some senses and narrower in others.[1] It is broader in substituting "provides, has provided, or has been engaged to provide" for the Agency's "is engaged to provide, or in fact provides." It is narrower in eliminating "medium," and in supplanting the broad terms "substantive information" and "having a rational relation to the nation's external national security" with a more usable "information of a kind the Agency needs to perform its intelligence function effectively." It is narrower also in adding the eminently appropriate requirement that the information be of a kind the CIA "could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it."

The Agency's definition effectively reads "intelligence source" as "information source," requiring protection of all sources of all information "rationally related" to national security.[2] As the majority opinion makes clear, that sucks into secrecy's maw too many sources of too many kinds of information. That the Agency's definition is unacceptable, however, is not alone sufficient basis for remand here.

---

1. For convenience, the definitions are juxtaposed:

   Present definition:
   "[A]n 'intelligence source' is a person or institution that provides, has provided, or has been engaged to provide the CIA with information of a kind the Agency needs to perform its intelligence function effectively, yet could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it."

   The Agency's definition:
   "An 'intelligence source' generally is any individual, entity or medium that is engaged to provide, or in fact provides, the CIA with substantive information having a rational relation to the nation's external national security."

2. We deal here only with Exemption 3, not with Exemption 1. Considerations of national security may go beyond inquiries on whether a potential adversary may already have certain information, and may encompass inquiries on whether the adversary knows the Agency knows, whether the adversary may learn the Agency is interested in knowing, and, of course, whether the adversary may learn of the Agency's source or sources of that certain information.

Application of the standard, that is, the majority's definition, does not in my view require determinations "conceptually distinct" from those made by, or foreclosed by the Agency to, the district court. Further, I find the implicated factual concerns identical.

Presumably, remand is thought necessary to allow the Agency to show that the 21 institutions and 185 researchers provided "information of a kind the Agency needs to perform its intelligence function effectively, yet could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it." But, as the record shows, the Agency has already established the "kind" of information here involved (research data on behavior modifying drugs). It has established its claimed need for the information, that is, to counter use of such drugs by potential adversaries and to develop its own capacity for their use. Whatever may be said of the wisdom or morality of the MKULTRA program and its operation, the Agency's need for the research data "to perform its intelligence function effectively" has not been challenged on this record. Hence, a remand is unnecessary to prove that element of the standard.

That leaves only the question of whether the information was of a kind the Agency "could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it." Yet proof of the answer to that question is precisely what the Agency has adamantly refused to seek or present, though the district court twice invited it to do so. The Agency effectively refused the district court's request for evidence of express or implied confidentiality promises by the Agency. It declined the district court's suggestion that it ask the researchers, in connection with Exemption 6, whether they even expected confidentiality. A remand to enable a party to do what it had specifically refused to do when initially before the district court, thereby allowing that party to force the conduct of piecemeal litigation, is in my view entirely inappropriate.

Further, what there is in the record on the subject indicates that the Agency had good reason for not attempting to prove the information unobtainable without a guarantee of confidentiality. From all that appears, the information *was* obtained without that guarantee, express or implied. The Agency dealt primarily through a front organization. If the Agency had promised confidentiality, explicitly or implicitly, it could have so established in the court below. That it did not, even in response to the court's invitation, should be taken as evidence that it could not and cannot do so on remand.[3]

Though the "substantial weight" standard was initially phrased in relation to classified records and those here are declassified, it is not necessary to base a present refusal to remand on that ground. That the court in *Halperin* gave substantial weight to the Agency's assertion respecting the effect of disclosure of the names of attorneys under contract for the CIA might have relevance if we were considering a "factual showing" of the effect of disclosure here.[4] The district court and this court have here been denied that showing, though the Agency has had more than ample opportunity to make it and to rely on a "substan-

3. Similarly, reclassification of the names, reliance on Exemption 1, or similar post–appeal actions in avoidance of disclosure by the Agency, would create an impression of playing fast and loose with the judicial process. With three years to consider reclassification, and more than two years to consider reliance before the courts on Exemption 1, the Agency may be presumed to have no sound basis for those actions. A contrary view would make the Agency appear to have engaged in judicial gamesmanship, holding back some defenses while it tries out others through an appeal, a practice not required to obtain a judicial pronouncement on the defenses asserted. The courts' treatment here of two defenses could have easily included a third.

4. The Agency has not here asserted that the institutions or researchers were working under a contract with the Agency or were otherwise "employees" under 50 U.S.C. § 403g (1976).

'tial weight" standard. If, as the majority correctly says, it would be "inappropriate for a court to abdicate any part of its responsibility to decide" when presented with such a factual showing, even in the face of a substantial weight standard, it would appear even more inappropriate for an appellate court to remand when the district court was specifically and unequivocally denied that showing.[5]

Hence I cannot join the conclusion that the district court applied an improper legal standard to the Exemption 3 defense. That defense rested on the Agency's definition of "intelligence sources." The district court, viewing that definition as overbroad (a proper legal standard), held the defense inadequate. We do the same, on the same ground. That we also "provide guidelines" will be helpful to the Agency, to others, and to the interests of judicial economy in future cases. Where, however, as here, the Agency cannot meet those guidelines, indeed, declined to even try meeting them when the district court (in different words) invited that effort, I would not remand. I would affirm the district court's judgment respecting Exemption 3.

5. It is true that courts should not require the impossible, and that predictions of what others might do if the names here sought were disclosed are necessarily speculative, but the time for those considerations is in my view past. Moreover, nothing of record remotely hints that the Agency will be able to do any more than repeat the bald assertions already made, namely, that disclosure of these names will impede willingness of others to work with the Agency. Whether the public today perceives the Agency as a pariah is not established on the record, but the disclosure of the names of institutions and researchers who were under the impression that they were not working for the Agency cannot be assumed to impede a willingness of others to work for the Agency when asked to do so. Presumably, also, those employing the FOIA to obtain the names here sought do not intend to risk continued viability of the statute by unnecessarily exposing those institutions and researchers to public ridicule solely on the ground that they were caught up without their knowledge in MKULTRA.