THE CITY OF CLEVELAND v. THOMAS, DIRECTOR OF
PARKS, ET AL.

*Municipal corporations—Contracts—Awarding to lowest and best bidder—Exercise of discretion—Board of control.*

Where by law authority is given to a city's board of control to let contracts to the lowest and best bidder, the discretion so conferred upon such board will not be interfered with by the courts in the absence of proof, by a preponderance of the evidence, that the board failed to exercise sound discretion or that there was an abuse of sound discretion.

(Decided November 5, 1921.)

APPEAL: Court of Appeals for Cuyahoga county.

*Messrs. Baker, Hostetler & Sidlo* and *Mr. Wm. B. Woods,* for plaintiff.

*Messrs. Tolles, Hogsett, Ginn & Morley,* for defendants.

SULLIVAN, J. This cause comes into this court on appeal from the court of common pleas of Cuyahoga county.

The pleadings and evidence disclose that on or about July 1, 1921, the city of Cleveland received sealed bids or proposals for providing and installing elevators for certain buildings being constructed as a part of the city hospital on Scranton road in the city of Cleveland.

Pursuant to the advertisement the following bids were received by the city through its board of control, duly authorized in the premises:

American Elevator and Machine Company ............................ $ 76,017.00

| | |
|---|---|
| Otis Elevator Company .............. | 91,645.00 |
| The Haughton Elevator and Machine Company ..................... | 92,266.00 |
| A. B. See Electric Elevator Company.. | 104,000.00 |
| The Warner Elevator Mfg. Company .. | 108,475.00 |

On or about the 15th day of July, 1921, the board of control passed a resolution awarding the contract for said elevators in said hospital buildings to The Otis Elevator Company, at a lump sum of $91,645, a difference of approximately $15,000 between its bid and the aforesaid bid of the American Elevator & Machine Company, whose bid was $76,017.

The plaintiff contends that the provisions of Section 7 of ordinance known as 31783-a, which provides among other things that the "Board of Control shall award the contract to the lowest and best bidder," were disregarded in the execution of the contract, and the plaintiff makes the further claim that the bid of the American Elevator & Machine Company was the lowest and best bid, instead of the bid of The Otis Elevator Company, as aforesaid.

The petition, and the amendment thereto, set up that the bid of the American Elevator & Machine Company conforms in all respects to the requirements of the plans and specifications of the city, on which bids were advertised and received, as fully and completely as the bid and proposal of The Otis Elevator Company accepted under the award of the board of control, and further allege that the American Company was able and sufficiently equipped to enter into a contract for, and to furnish and deliver the elevators to the city of Cleveland, in accordance with its proposal and bid, as promptly and efficiently as The Otis Elevator Company.

The prayer of the petition is that the defendants be enjoined from in any manner attempting to perform the contract with The Otis Elevator Company, from paying out any funds of the city of Cleveland for work and material furnished under the contract, and from attempting in any manner to perform the contract, and that upon a final hearing the injunction prayed for be made perpetual.

The answer of the defendants admits the awarding of the contract by the board of control for the sum aforesaid, and avers that on the 20th of July, 1921, a contract for furnishing the elevators was entered into by and between the city of Cleveland and The Otis Elevator Company.

In a second defense of the answer the defendants allege in substance that said board of control, after an investigation, reached the conclusion that the elevator proposed to be furnished by The Otis Elevator Company was in many respects far superior and better adapted to the use of the proposed hospital buildings than that proposed to be furnished by the American Elevator & Machine Company; that all things considered the bid of The Otis Elevator Company was the lowest and best bid; and that the board of control for that reason awarded the contract to The Otis Elevator Company in the exercise of the discretion reposed by law in the board of control.

In the amendment to the petition of. plaintiff, and in the evidence, the validity of the proposal and the specifications of The Otis Elevator Company are attacked in many respects, and the grounds of contention with respect thereto are specifically set forth in the allegations of the amendment to the petition.

By reason of the alleged invalidity averred in

the amendment to the petition, the plaintiff claims that the proposal and bid of The Otis Elevator Company did not respond to the specifications and requirements of the city of Cleveland on file in the office of the city architect, and, in consequence thereof, the further allegation was made that the bid of The Otis Elevator Company was not competitive with the bids and proposals of others who filed their bids and proposals with the city of Cleveland in accordance with its advertisement therefor.

It is beyond dispute that discretion, in the absence of fraud, collusion, notion or caprice, is vested in the board of control by authority of law with respect to determining finally which is the lowest and best bid.

Bearing upon this question, in the case of *State, ex rel. Cleveland Trinidad Paving Co.,* v. *Board of Public Service of Columbus,* 81 Ohio St., 218, the court says, at page 224:

"Running all through the legislation is a plainly implied if not expressed purpose to clothe the Board of Public Service with a wide discretion in dealing with the making of contracts for street improvements, the various precautionary provisions being intended to safeguard the public in its dealing with contractors. The board may reject any and all bids. If there be reason to believe there is collusion or combination among bidders, the bids of those concerned therein *shall* be rejected. True, the language is that the board shall make a written contract with the lowest and best bidder (that is, no contract shall be made with any but the lowest and best bidder) but the board is to determine who of all the bidders is the lowest and best, and no limit is placed respecting the time when the determination shall be made,

nor is there any requirement refusing to the board
the power, usually accorded to all municipal bodies,
to rescind its action in a proper case.  In the ab-
sence of such provision the proposition is a fair
one that the usual rule prevails.  That rule, well
settled by numerous adjudications, is to the effect
that the action of such bodies respecting legislative
or administrative matters is not always conclusive,
and beyond recall, but that they are possessed of
inherent power to reconsider their action in matters
of that nature, and adopt if need be the opposite
course in all cases where no vested right of others
has intervened, the power to thus act being a con-
tinuing power.  The powers involved in this inquiry
are administrative powers, and necessarily they
must involve the right to reconsider action thereto-
fore taken, and, in the absence of a showing that
fraudulent intent existed to the injury of the com-
plaining party, courts will not interfere.  In this
case, under the statute cited, it is quite clear that
the real substantial object to be attained is the mak-
ing of the written contract; it is the only contract
authorized by the statute, and all that precedes is
but preliminary to the efficient object, viz.: the writ-
ten contract.  Until that is executed the city is not
bound.  In the present case the board was author-
ized to bind the city by the written contract specified
in the statute, but was wholly unauthorized to bind
the city by any other contract.

"As conclusion, we regard the rule, entirely
settled as we think, that where authority is given by
statute to a board to let a contract to the lowest and
best bidder, discretion is thus conferred and courts
will not undertake to control such discretion by
mandamus applied to this case.  *Ex parte Black*, 1

Ohio St., 30; *The State* v. *Commissioners,* 36 Ohio St., 326; *The State* v. *Commissioners,* 63 Ohio St., 440. Among many authorities cited by the vigilant counsel for defendant in error special attention is directed to the following: *Choppin* v. *Herman,* 6 N. P., 452; *Ross* v. *Stackhouse,* 114 Ind., 200; *Red* v. *Augusta,* 25 Ga., 386; *Water Commrs.* v. *Brown,* 32 N. J. L., 504; *McClain* v. *McKisson,* 15 C. C., 517; *Braman* v. *Elyria,* 5 C. C. (N. S.), 387, aff. in 73 Ohio St., 346; *Yaryan* v. *Toledo,* 8 C. C. (N. S.), 1; Page on Contracts, Secs. 43, 54; *Edge Moor Bridge Works* v. *Bristol,* 170 Mass., 528; *Benton* v. *Springfield Y. M. C. A.,* Id., 534; *Dunham* v. *City of Boston,* 12 Allen, 375; *People's Railroad* v. *Memphis Railroad,* 10 Wall., 38; *Stoddart* v. *Galman,* 22 Vt., 568; *Cox* v. *Mount Tabor,* 41 Vt., 28; *Estey* v. *Starr,* 56 Vt., 690; *Capital Ptg. Co.* v. *Hoey,* 124 N. C., 767.

"It may be added that persons dealing with municipal corporations must at their peril take notice of all grants of power and of all limitations of authority on the part of municipal agents, and that in the present case the relator must be held to have had notice of the scope of the powers of the board and the prescribed manner of their exercise."

In case No. 3817 of this court of appeals, decided July, 1921, wherein the City of Cleveland was plaintiff and Thomas S. Farrell *et al.* were defendants, the language of the court is:

"Had that contract been let upon bids that were submitted by the contractors, including everything that was to be bid on for the construction of the reservoir, in the absence of an allegation of fraud and proof of the same, undoubtedly the Board of Control would have been within its rights in letting the contract to The Hunkin-Conkey Construction Com-

pany, for, if we understand the rules of law, the discretion vested in the Board of Control to determine the lowest and best bid is not subject to judicial control.''

The rule is stated in a note in 38 L. R. A., N. S., 655:

''The general rule as deduced from the cases is that, in awarding contracts of this nature, public authorities are vested with discretion in determining who is the lowest and best bidder, and their decision will not be interfered with by the courts, even if erroneous, provided it is based on a sound and reasonable discretion, founded on facts and exercised in good faith, in the interest of the public, without collusion or fraud, nor corruptly, nor from motives of personal favoritism or ill-will, and not *abused.''*

We also cite *Coppin, a Taxpayer,* v. *Hermann et al., Commissioners, etc.,* 6 N. P., 452. That was a Cincinnati superior court case, and was affirmed in *Coppin, a Taxpayer,* v. *Hermann et al., Trustees, etc.,* 7 N. P., 528, by that court at general sessions, and was affirmed without opinion in *Coppin, a Taxpayer,* v. *Hermann et al., Trustees,* 63 Ohio St., 572. The fifth proposition of the syllabus is as follows:

''But if the *means, manner* or *method,* by which the act or decision is reached, be *wrongful, fraudulent, collusive,* or *arbitrary,* the courts can inquire into these facts; and, if found true, they will set aside the act or decision which is the result of them.''

In the case of *United States Wood Preserving Co.* v. *Sundmaker,* 186 Fed. Rep., 678, the law as above quoted is substantially declared by the U. S. circuit court of appeals for the sixth circuit.

Although the authorities are universal and overwhelming, it is useless to quote more for the reason that the law is undisputed by opposing counsel in this case.

The court is of the opinion, from the pleadings, evidence and a careful review of the record in this case, and the learned and exhaustive briefs of counsel submitted, that a substantial compliance with the city's specifications was made in the bids or proposals of The Otis Elevator Company and the American Elevator & Machine Company.

Whatever discrepancies appear between the proposals and the city's specifications seem to the court to apply as much to one bidder as the other. Neither bid, in our opinion, was invalid because of any substantial informality in the same, and for the purposes of acceptance and contracting both bids practically responded to and conformed with the city's specifications, bearing in mind always that the city's specifications would become a part and parcel of the contract when executed.

In the contract awarded to The Otis Elevator Company the specifications were attached to and became a part of the terms of the contract itself. Whatever minor differences there were between the city's specifications and the proposals and bids of the contending bidders herein could unquestionably have been reconciled with the specifications of the city at the time of the execution of the contract. Both bids, we think, were made in good faith.

The only vital question remaining in the case to be considered, and which is determinative of the issue, is whether the board of control, in the proper performance of its duty, exercised sound discretion in the awarding of the contract to The Otis Elevator

Company, after a consideration of not only the bid of the American Elevator & Machine Company, but of all the five bids aforesaid mentioned, reaching from the sum of approximately $76,000 to the sum of approximately $108,000, the bid of The Warner Elevator Manufacturing Company.

To analyze the question closer, from a strictly legal standpoint, under the law governing the discretion of public bodies, the vital issue is whether the board of control failed to exercise sound discretion with respect to the aforesaid bids or proposals in awarding the contract to The Otis Elevator Company for the sum of $91,000, approximately, and, whether, under all the circumstances, the bid of The Otis Elevator Company was the lowest and best bid submitted.

This question is ascertainable in two ways. First, what does the evidence disclose upon the question of examination, consideration, and investigation, as to the judgment of the board of control upon the submission of the bids on July 1, 1921, until the awarding and execution of the contract on July 15, 1921, and, second, what does the evidence disclose as to whether or not the investigation and examination made by the board of control after the awarding of the contract supported and approved its action in awarding the contract to The Otis Elevator Company? In other words, do the facts discovered after the awarding of the contract, as disclosed by the evidence, support the judgment and discretion of the board of control exercised prior to and at the time of the awarding of the contract?

We have taken both of these phases into consideration in determining whether the board of control, in accepting the bid of The Otis Elevator Company,

and awarding to it the contract, exercised sound discretion. To put it another way: whether or not there was a failure to exercise sound discretion, or whether there was an abuse of discretion at the time of the acceptance of the bid and the awarding of the contract to The Otis Elevator Company.

The evidence tends to prove that prior to the awarding of the contract and after the submission of the bids, Dudley S. Blossom, director of public welfare of the city of Cleveland, with peculiar qualifications for making a reliable investigation, as disclosed by the evidence, and at the instance of the defendant, Fred L. Thomas, director of parks and public property, set on foot certain inquiries and made numerous examinations touching the question as to which of the bids was the lowest and best. His reports on said inquiries and investigations were made to the board of control, and discussions were had thereon between himself and the aforesaid director Thomas, a member of the board of control, which was authorized under law and ordinance to exercise its discretion in determining the lowest and best bidder.

On page 169 of the record appears the following:

"Q. I will ask you whether or not, in connection with the investigation made by you, you conferred with the director of parks and public property? A. I did."

Again, on pages 169 and 170, Mr. Blossom, in answer to questioning, said:

"The architect took the bids after they were opened, studied them and made such investigation as was proper, and a few days afterwards * * * after receiving then the recommendation of the architect that the Otis Elevator bid be accepted * * *."

An objection was made to this testimony, but afterwards withdrawn.

A careful reading of the testimony of Mr. Blossom tends to prove that after he discovered the fifteen thousand dollars difference between the two contending bids, notwithstanding he already had the recommendation of the architect in favor of the Otis elevator, he conversed with the supervising engineers of the new city hospital job; that Mr. Boyd, the Cleveland representative of the firm of Clarke, McMullen and Riley, supervising engineers at the new city hospital, and Mr. McMullen, one of the partners of the firm, who came on from New York apparently for that purpose, came to his office and discussed the question of installations, and informed him that they knew of no installations of the American Elevator & Machine Company; that he discussed with them the question of alternating current, and requested them to examine and report, after a careful investigation, the installation at the Winton Hotel, which he had learned had been installed by the American Elevator & Machine Company; that the aforesaid Messrs. Boyd and McMullen reported to him the next day that they had visited the Winton and had talked to the chief engineer, who reported considerable difficulty with the controls; that the elevators were inclined to speed up to such an extent that the operators on the cars became panicky; and that the engineer at the Winton had reported to them that the elevators were now running satisfactorily but that they had certain troubles with the controls. Mr. Blossom further testified that in order to make a further investigation he wrote to a friend in Louisville, Ky., the home of the American Elevator & Machine Company, and requested him

to make a careful investigation and report, which report he received in the way of a letter; that after receiving said letter he visited the two Otis installations in Cleveland and examined the operation of the same, with a view as to their operation of the micro-leveling device, which brings the elevator to the level of the floor automatically; that he visited the new clinic on 90th street and Euclid avenue, and examined another Otis installation, which had alternating current, the same as that to be used at the city hospital; that a Mr. Bryson of the Walker & Weeks Company accompanied him on that trip to help him interpret the technical side of the elevators, and to point out whatever should receive his attention; that he examined the machinery and rode up and down in the elevator; that he found the same working satisfactorily; that he talked with the head men of the clinic, who were responsible for the installation of the Otis elevator there, and that he talked with Dr. Lower and Dr. Crile, the surgeons in charge, and received statements from them as to the working of the Otis elevators in said clinic.

From pages 193 and 194 we quote the following from the testimony of Mr. Blossom, as bearing upon information received after the execution of the contract as applying to and approving information received prior to the making of the contract:

"Q. And then for the first time you met Mr. Kellogg; is that right? A. That was the first time I met him.

"Q. And you were introduced by whom? A. I went up there alone, as I remember.

"Q. Mr. Olmsted? A. I was introduced by Mr. Olmsted, yes.

"Q. Did you talk to him about the elevators there, or did you ask him to come to the city hall? A. I asked him to come to the city hall. I talked to him there first.

"Q. Was your information that you got from him there that day in all respects as you got it from your engineers? A. In all respects."

Again, recurring to the testimony of Mr. Blossom upon a subject-matter that applied to the status at the time of the execution of the contract, and which also in the main arises from what must have been patent to the board of control at the time of the execution of the contract, we quote the following from the record at pages 203 and 204:

"A. The major considerations were, first, that the American Elevator Company in submitting their bids, submitted a list of installations in New Mexico, Texas, Oklahoma, Paducah, Kentucky, places far, far away, scattered all over the world. The Otis specifications referred me to installations in our own home town, that I could investigate and look into. They have furnished elevators in the best buildings in the country, New York, Chicago and Cleveland. They are a company whose name stands for the best in elevators. That is the first consideration. The second consideration—I call it a major one—is that I feel that elevators in a city hospital are as vital as light and heat. They have to do with the lives of patients. If the elevators break down, and you have to have a man come from Louisville, Kentucky, to do the repairing, which is a technical thing, and the engineer may not be able to do it, it takes at least twenty-four hours. If you need repairs you have to send to Louisville, Kentucky, or if it is a repair of the motor you might have to send to any

number of manufacturers of motors which the American people are using. They aren't using any one motor. That is the second consideration. Those are the two main considerations.

"Q. Those are the two main considerations? A. Yes, sir.

"Q. I don't want to break in on your train of thought. A. I think there are other considerations, but right at this moment I can't recall.

"Q. So that you knew of course the Otis reputation before you had the bid; you knew they were the biggest elevator company in the country, had installed more perhaps than any other; had a good reputation, and were in many of the prominent buildings of the country? A. I didn't know they were the biggest in the country, but I thought so.

"Q. And you knew that they had a local shop here in town? A. Yes, sir.

"Q. That is, they are right up alongside the East Ohio Gas Company, one of our monumental buildings? A. Yes, sir.

"Q. So those two considerations were known in your mind to be in favor of the Otis Company before the bidding, were they not—before the advertising and competition? A. I had never heard of the American. I had heard of the Otis."

As to the second question, to-wit, whether the character of the evidence as to the investigation and examination made by the board of control after the awarding of the contract supported and approved the action of the board in awarding the contract to The Otis Elevator Company, or whether such evidence weakened the conclusion reached and the discretion exercised at the time of the awarding of the contract to The Otis Elevator Company, we will not attempt

to quote all the evidence upon the subject, but cite the evidence of Mr. Blossom on pages 205, 206 and 207, which is as follows:

"Q. Did you ever ask them where the $15,000 difference in price was?

"Mr. Hogsett: Before?

"Mr. Hostetler: Before the letting, yes.

"A. Of course.

"Q. Did you ever ask them, 'Now, boys, how do you account for this $15,000 difference in these two bids?' A. I think I didn't ask any such question before the award.

"Q. How much of that $15,000 do you think should be allowed for being a Cleveland concern with a service station? Did you figure that out in your mind? A. I did.

"Q. And you figured what, about? A. I figured that if we installed the American elevator, and the American elevator broke down in the City Hospital, and the life of a patient was lost, due to such breakdown, that $15,000 was a bagatelle.

"Q. And that is the theory on which you decided that question, is it? A. That had great weight.

"Q. Then how much did you allow for this overwhelming Otis name, this great company, its prestige? A. I didn't work that out in dollars and cents.

"Q. You lumped it together? A. The name to me spelled *confidence.*

"Q. And it was for that that you thought the city should be willing to pay the additional $15,000? A. I did.

"Q. I notice here on the Otis specifications the list of installations as requested by paragraph 53, the Cooke County Hospital, Chicago, Illinois. Was

it because that was not quite so far away as Paducah, that it didn't affect you? A. I didn't get your question.

"Q. Chicago, Illinois, that is not a Cleveland institution? A. No, sir.

"Q. And the Rockefeller Institute of Physical Research in New York? A. No, sir.

"Q. Those did not weigh with you the same as they did when considering the citations of the American? A. They weighed more."

The evidence quoted heretofore, taken in connection with all the evidence in the case which we have reviewed that bears upon the investigation of the board of control or its representatives after the execution of the contract, places us upon inquiry as to whether or not the evidence would warrant a conclusion by this court that there was a failure to exercise a sound discretion on the part of the board of control at the time of the execution of the contract, or whether there was an abuse of sound discretion on the part of such board at that time. The record showed, among other things, the establishment of the business of The Otis Elevator Company in 1853, and that it had been in continuous service ever since; that its reputation was high; that its financial ability was beyond dispute; that it had a local service station in the city of Cleveland, where personal service could be sought and rendered in case of need; that there were many places where installations had been made and satisfactory service therein rendered; that from its reputation and standing in the business world there was no reasonable ground for apprehension as to its ability to fulfill the contract according to its proposal in connection with the specifications of the city; that one of the most

vital elements in the construction of the four million dollar plant was the adequate equipment and safe operation of the elevators; that a question of the safety of life and limb was a logical subject of thought and consideration; that the recommendation and advice of the architect and engineers were worthy of thought and consideration; that there were three higher bids than the one accepted, ranging from $92,000, approximately, to $108,000, approximately, a difference of about $16,800 between the bid of The Otis Elevator Company and the highest bid, to-wit, that of The Warner Elevator Manufacturing Company; that this range of prices was a proper subject of consideration in the exercise of discretion; that these circumstances and conditions were subjects that would naturally approach the deciding minds; that another natural question logically arising from the above propositions would be whether these considerations, or any one of them, would outweigh the excess figure of $15,000, especially when applied to an instrumentality upon whose safety depended the security of that character of human beings who make residence in public hospitals. Counsel for plaintiff raise the question that inasmuch as the board found that the bid of The Otis Elevator Company was the best bid, it was no finding at all, under the authority of law vested in the board of control, because it did not find that the bid was the lowest and best bid. The court is of the opinion that this objection is not well taken, for it is our judgment that a reasonable interpretation of the word "best," in the light of the fact that all of the bids were before the board, is "lowest and best," and from these considerations, and others apparent upon the record, not herein mentioned, and from

all of the evidence in the case as it applies to the investigations made before and after the awarding of the contract, the court is of the opinion that it is not warranted in the face of the authorities quoted above and appearing in the briefs of both the plaintiff and defendants in holding that there was a failure on the part of the board of control to exercise a sound discretion, at or prior to the time of the execution of the contract, or in holding that there was an abuse of sound discretion on the part of the board of control in the premises, especially in view of the rule of law that the burden of proof to establish these propositions by a preponderance of the evidence is upon the plaintiff herein, and from all the evidence in the case the court holds that the board of control, at the time of the awarding of the contract, exercised that sound discretion vested in it by authority of law in such cases made and provided.

The prayer of the petition and the amendment thereto is, therefore, denied by the court, and the petition and amendment thereto are hereby dismissed.

*Petition dismissed.*

VICKERY, P. J., and INGERSOLL, J., concur.