PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4574
_____

In re:  MARCAL PAPER MILLS, INC.,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cv-01863)
District Judge:  Honorable Stanley R. Chesler
_____

Argued February 16, 2011

Before: SLOVITER and HARDIMAN, Circuit Judges
and JONES,[*] District Judge

(Filed  June 16, 2011)
_____

Gerald H. Gline, Esq.
Cole, Schotz, Meisel, Forman & Leonard
25 Main Street-Court Plaza North
P.O. Box 800
Hackensack, NJ  07601

---

[*] Hon. C. Darnell Jones, II, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

James M. Hirschhorn , Esq. (Argued)
Andrew H. Sherman, Esq.
Sills, Cummis & Gross
One Riverfront Plaza
Newark, NJ  07102

           Attorneys for Appellant

David Grossman, Esq.
Paul A. Montalbano, Esq.  (Argued)
Cohen, Leder, Montalbano & Grossman
1700 Galloping Hill Road
Kenilworth, NJ  07033

           Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SLOVITER, *Circuit Judge*.

           This appeal, which arises from a bankruptcy proceeding, presents only one issue, but it is an issue of first impression in this Circuit and requires interpretation and reconciliation of two important and complex federal statutory schemes and their underlying policies.  Specifically, it requires us to decide whether under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), the portion of withdrawal liability that is attributable to the post-petition time period constitutes an administrative expense entitled to priority under the Bankruptcy Code.  The District Court, overturning the Bankruptcy Court decision, held that it does and that the post-petition portion of the multiemployer fund's withdrawal liability claim against debtor Marcal Paper Mills, Inc. was entitled to priority. Marcal Paper Mills, LLC (hereafter "Marcal LLC"), who purchased the assets of the debtor Marcal Paper Mills, Inc. (hereafter "Marcal") and assumed liability for this claim,

2

appeals, arguing that the entire claim for withdrawal liability should be classified as a general unsecured claim.

## I.

Marcal, which manufactured paper products, operated a fleet of trucks to distribute its products. The truck drivers employed by Marcal were members of Teamsters Union Local 560. Local 560 was the collective bargaining representative for those employees and, over the years, entered into a series of collective bargaining agreements ("CBAs") with Marcal. As part of the CBAs, Marcal was required to participate in the Trucking Employees of North Jersey Welfare/Pension Fund ("TENJ Pension Fund" or "Fund") — a multiemployer defined benefit pension fund.

On November 30, 2006, Marcal filed a Chapter 11 bankruptcy petition and Marcal operated as a debtor-in-possession ("DIP") from that date, continuing to employ members of Local 560. The CBA governing the employees' work and requiring Marcal's participation in the TENJ Pension Fund did not expire until September 15, 2007. Aware that the CBA was set to expire, on August 16, 2007, DIP Marcal and Local 560 entered into a Memorandum of Understanding continuing the terms of the CBA until a new contract could be negotiated. The parties were never able to negotiate a new contract. Nevertheless, because the CBA and pension plan were continued and DIP Marcal continued to employ covered employees, those employees accrued pension credits and the corresponding benefits. In addition, under the continued-CBA DIP Marcal was required to satisfy its TENJ Pension Fund obligations. One of those obligations was that DIP Marcal continue to make contributions to the TENJ Pension Fund on behalf of covered employees. DIP Marcal made all such contributions from November 30, 2006, the date of its Chapter 11 petition, until May 30, 2008, when DIP Marcal's assets were sold to Marcal Paper Mills, LLC. From that date, Marcal LLC ceased to employ Local 560 truck drivers. Accordingly, there is no dispute that Marcal LLC had no obligation to make contributions or provide benefits associated with work after May 30, 2008.

As a consequence of DIP Marcal's cessation and the fact that Marcal LLC did not employ Local 560 drivers, the TENJ Pension Fund determined that DIP Marcal had made a "complete withdrawal" from the pension fund within the meaning of ERISA, as amended by the MPPAA. The TENJ Pension Fund assessed Marcal with $5,890,128 in total withdrawal liability. On July 29, 2008, the TENJ Pension Fund filed a claim in Marcal's bankruptcy proceeding for the entire amount of withdrawal liability as a post-petition administrative claim under 11 U.S.C. § 503(b) of the Bankruptcy Code. Marcal objected to the TENJ Pension Fund's claim that the withdrawal liability be classified as an administrative expense and filed a motion to reclassify it as a general unsecured claim. In response, the TENJ Pension Fund altered its claim and only sought administrative priority for that portion of the withdrawal liability attributable to post-petition services provided by Local 560 employees to DIP Marcal.

Notwithstanding, the Bankruptcy Court rejected TENJ Pension Fund's claim and reclassified the entire withdrawal liability claim as a general unsecured claim. The District Court subsequently reversed and held that the portion of the withdrawal liability attributable to the post-petition period was entitled to priority. It remanded the matter to the Bankruptcy Court to calculate how the claim should be apportioned between pre- and post-petition periods. *Trucking Emps. of N. Jersey Welfare Fund, Inc., v. Marcal Paper Mills, Inc.*, 2009 WL 3681897, at *8 (D.N.J. Nov. 2, 2009). Marcal LLC appeals.

## II.

The District Court had jurisdiction over the appeal of the Bankruptcy Court's classification of the claim pursuant to 28 U.S.C. § 158(a)(1) and 28 U.S.C. § 1334(a). Under 28 U.S.C. § 158(d)(1), we have jurisdiction of "appeals from all final decisions, judgments, orders, and decrees entered" by a district court pursuant to its authority to hear appeals from final judgments, orders, and decrees entered by a bankruptcy

4

court.  We have held that because of the unique nature of bankruptcy cases, finality under § 158(d)(1) should be viewed "in a more pragmatic and less technical way" than it would under 28 U.S.C. § 1291.  *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.)*, 844 F.2d 99, 103 (3d Cir. 1988).

To determine whether a decision is final, we consider three factors: (1) "the impact of the matter on the assets of the bankruptcy estate," (2) "the preclusive effect of a decision on the merits," and (3) "whether the interests of judicial economy will be furthered."  *Id.* at 104.  Consistent with Supreme Court precedent, we hold that the District Court's decision classifying the post-petition portion of withdrawal liability as an administrative expense was final, and that judicial economy is served by resolving this issue now, rather than after the estate has been conclusively divided.  *See Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006) (decision regarding the priority of a claim is final and appealable); *see also In re Saco Local Dev. Corp.*, 711 F.2d 441, 445-46 (1st Cir. 1983) (same).

To the extent that this appeal involves a question of law regarding whether withdrawal liability, or at least a portion thereof, can qualify as an administrative expense under the Bankruptcy Code, our review is de novo. *Schlumberger Res. Mgmt. Servs., Inc. v. CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003).

### III.

As mentioned, the question in this case is whether withdrawal liability, as defined by ERISA, as amended by the MPPAA, should be apportioned between pre- and post-petition periods and, if so, whether the post-petition portion qualifies as an administrative expense as defined by the Bankruptcy Code.  Accordingly, we begin with the language of the statutes.

Title 11 U.S.C. § 507(a)(2) of the Bankruptcy Code provides that administrative expenses allowed under § 503(b) are entitled to priority over the claims of general unsecured

5

creditors. Section 503(b)(1)(A) defines administrative expenses as "the actual, necessary costs and expenses of preserving the estate including . . . wages, salaries, and commissions for services rendered after the commencement of the case [i.e. after the filing of the bankruptcy petition]." Interpreting this provision, we have explained that in order to qualify for administrative priority, an expense "must arise from a [post-petition] transaction with the debtor-in-possession" and the expense "must be beneficial to the debtor-in-possession in the operation of the business." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532-33 (3d Cir. 1999) (quotations and brackets omitted). Pursuant to the statute's terms, the expense must also be actual and necessary. *Id.*

These requirements balance two important goals. By giving priority to those claims that help keep the debtor-in-possession functioning, "sections 503 and 507 advance the estate's interest in survival above all other financial goals." *Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 627 (3d Cir. 1990). By limiting priority to those claims that are actual and necessary, the Code prevents the estate from being consumed by administrative expenses, and preserves the estate for the benefit of the creditors. *See Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs, Inc.*, 178 F.3d 685, 690 (3d Cir. 1999) (holding that "Chapter 11 is intended to rehabilitate the debtor and avoid forfeiture by creditors") (quotations and brackets omitted). Consistent with the objective of preserving the estate for creditors, the burden to demonstrate that an expense deserves administrative priority lies with the party asserting such priority, here, the TENJ Pension Fund. *See In re O'Brien*, 181 F.3d at 533.

Thus, as applied to this case, the relevant inquiry is whether any portion of the withdrawal liability owed by Marcal LLC to the TENJ Pension Fund is a post-petition expense provided in exchange for a service that was actual and necessary for the continued operation of DIP Marcal. In this regard, it is helpful to distinguish between the nature of withdrawal liability and how withdrawal liability is calculated. Both shed light on the relevant question.

The MPPAA instituted withdrawal liability in response to a shortcoming in the original ERISA statute regulating multiemployer defined benefit pension plans. A defined benefit plan, such as the TENJ Pension Fund plan, "is a pension plan under which an employee receives a set monthly amount upon retirement for his or her life, with the benefit amount typically based upon the participant's wages and length of service." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 595 n.8 (3d Cir. 2009). In other words, the employer has promised the employee a certain pension benefit. The benefit level is set by the plan trustee based on the "expected resources" of the plan. Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong. Rec. S20189, S20191 (July 29, 1980) ("Joint Explanation"). "The resources of a plan available to pay those benefits consist of assets held by the plan." *Id.* at S20191. Those assets include, "[f]uture contributions expected by the plan and income expected to be earned on plan investments." *Id.* Accordingly, in a defined benefit plan, the employer's continuing contributions to the plan are designed to provide a subsequent benefit to the employee upon retirement.[1]

As set forth in the Joint Explanation, even if an employer has made all of its contributions to date, "[b]ecause benefit promises may be funded over many years after they are made, the withdrawing employer may not have made sufficient contributions to the plan to fund a fair share of the

---

[1] *See* Marcal's Motion to Reclassify the Administrative Proofs of Claim of the TENJ Pension Fund, App. at 352 ("The CBA required, among other things, that the Debtors pay certain benefits and make contributions to the Teamsters Union's health, welfare and pension funds, including the Teamsters Union's multiemployer pension plan."). We note that the TENJ Pension Plan itself was not submitted on appeal or contained in the record below. Nevertheless, there appears to be no dispute regarding the terms of the plan or that it is a multiemployer defined benefit plan.

7

cost of those benefit promises." *Id.* at S20192. In contrast, a "defined contribution plan is a retirement plan whereby the employer, employee, or both make contributions to an individual's account during employment, but with no guaranteed retirement benefit, and with the ultimate benefit based exclusively upon the contributions to, and investment earnings of the plan. The benefit ceases when the account balance is depleted, regardless of the retiree's age or circumstances." *In re Schering Plough*, 589 F.3d at 595 n.8.

As explained in the "General Reasons for the Bill" section of the Joint Explanation, ERISA, in its original form, allowed employers to withdraw from defined benefit plans and escape their obligations to provide benefits, crippling the plan. "One of the most serious threats to the security of benefits under a multiemployer plan is an unanticipated decline in employment covered by the plan. Where this occurs, the plan is unlikely to have the resources necessary to provide benefits promised to employees. . . . Under ERISA, an employer who has paid all required contributions to a multiemployer [plan] can withdraw from the plan and, if the plan does not terminate within 5 years after the withdrawal, the employer will have no further responsibility for any part of the unfunded liabilities of the plan." Joint Explanation at S20191-92.[2] Withdrawal liability was implemented to

---

[2] Put even more forcefully by the House Report: "The current rules for employer liability upon the withdrawal of the employer are inequitable and dysfunctional because: (1) employers who withdraw from a plan early are rewarded, while employers who remain with a plan are penalized, and (2) there is no provision for compensation to a multiemployer plan for a withdrawal." H.R. Rep. No. 96-869(1), at 60 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918, 2928 ("House Report"); *see also Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc. (In re McFarlin's, Inc.),* 789 F.2d 98, 102 (2d Cir. 1986) ("As originally structured ERISA allowed some employers to withdraw from pension plans without requiring them to pay for benefits promised to and earned by their employees . . . . The withdrawal of employers allowed

alleviate this problem and ensure that employers could not avoid their obligation to provide a promised benefit by withdrawing, thereby hurting their employees and the entire pension fund's health.

With an understanding of the purpose of withdrawal liability and the problem it was designed to repair, we can examine how it did so. The MPPAA provides that if an employer withdraws from a multiemployer plan, then the employer is liable for its proportionate share of the "unfunded vested benefits." 29 U.S.C. § 1381(b)(1). Unfunded vested benefits are "calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984). Section 1391 of the MPPAA provides various methods for calculating what portion of the plan's underfunding is allocable to a particular employer as its withdrawal liability. And the plan trustee possesses the discretion to choose which method of calculation to employ (although the plan's final actuarial calculation may be challenged by the employer). *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 609, 611 (1993). Broadly speaking, the Act "requires that a withdrawing employer continue funding a *proportional* share of the plan's unfunded benefit obligations." House Report, 1980 U.S.C.C.A.N. 2918, 2935 (emphasis added).

Section 1391 "extrapolate[s] the employer's proportionate share of the plan's unfunded, vested benefits from such factors as the employer's past contributions to the plan and the portion of the plan's unfunded benefit obligations attributable to the employer's employees." *In re McFarlin's*, 789 F.2d at 103. Although the calculation can be quite "complex . . . [it] is based largely on the withdrawing employer's contribution history over the five . . . years preceding the withdrawal." *CenTra, Inc. v. Cent. States Se. & Sw. Areas Pension Fund*, 578 F.3d 592, 599-600 (7th Cir.

---

them to leave plans without fully funding the benefits vested in, and therefore earned by, their employees up to the time of the withdrawal.").

2009), *cert. denied*, 130 S. Ct. 1885 (2010).  Indeed, in this case, both parties agree that a withdrawing employer's proportionate share of the unfunded vested benefits is "based on [the] contributions [it was obligated to pay] for the 5 years preceding withdrawal."  Appellant's Br. at 21 n.3; *see also* Appellee's Br. at 20.

To summarize, withdrawal liability is calculated by, first, determining the plan-wide shortfall between the plan assets and the vested benefits the plan owes to employees. Second, once the overall size of the shortfall has been determined, the withdrawing employer's share of that shortfall is determined by calculating, in essence, the proportionate share owed to the withdrawing employer's covered employees based on the employer's contribution share over the prior five years.

Based on the above analysis, it is clear that the covered employees were required to perform work post-petition in order to keep DIP Marcal in operation, unquestionably conferring a benefit to the estate.  Pursuant to the continued-CBA and pension plan, Marcal promised to provide pension benefits in exchange for that post-petition work.  The portion of the withdrawal liability which corresponds to that post-petition work is owed by Marcal LLC in fulfillment of the promise it assumed as part of its purchase of Marcal's assets to provide pension benefits in consideration for that necessary post-petition work.  Therefore, the requirements of 11 U.S.C. §§ 503(b)(1)(A) & 507(a)(2) of the Bankruptcy Code are satisfied.  We agree with the District Court and hold that the portion of the withdrawal liability attributable to the post-petition period is entitled to administrative priority.

Marcal LLC advances two principal arguments in opposition to this conclusion, neither of which is persuasive. First, it argues that because the amount of its withdrawal liability will be based on a variety of factors, some of which have nothing to do with the work performed by the covered employees, withdrawal liability cannot be considered an administrative expense.  Without question, the existence of withdrawal liability and its size will depend on how the

Fund's assets have fared in the market, how much money has been withdrawn by retired employees, and other actuarial assumptions. But that does not alter the fact that the amount owed to the TENJ Pension Fund is based upon Marcal's decision to take advantage of work provided by covered employees. In turn, the portion of that employee work that occurred post-petition was wholly dependent upon DIP Marcal's decision to employ covered teamsters while operating as a debtor-in-possession. It is simply not seemly for Marcal LLC to disclaim responsibility for the vested benefits Marcal created by choosing to use covered employees to perform post-petition work.

The size of the benefit owed to a particular employee is determined, in part, by the amount of time that employee worked for Marcal. *In re Schering Plough*, 589 F.3d at 595 n.8. To the extent that the employees worked for Marcal post-petition, they continued to accrue new vested benefits under the CBA and the TENJ Pension Fund plan. The following is the District Court's helpful explanation:

> The obligation to make [a withdrawal liability] payment . . . would not exist but for the insolvent employer's deliberate decision to use the services of the covered employees pursuant to the terms of compensation negotiated in the collective bargaining agreement. Put differently, a portion of the accelerated pension funding [the withdrawal liability] is premised on the bargaining unit employees' earned credit toward their future right to collect pension benefits in consideration of their work for the debtor in possession. Instead of financing the deferred compensation through monthly contributions, as it would do if it continued to participate in the multiemployer fund, the withdrawing employer is required to make a lump sum payment to the fund. Neither this requirement, nor the existence of insurance provided by the Pension Benefit Guaranty Corporation for benefits owed to covered employees by the fund, alter the basic character of the withdrawing employer's debt - that is, incurred in

11

return for the employees' service to the employer post-petition.

*Trucking Emps. of N. Jersey Welfare Fund, Inc.*, 2009 WL 3681897, at *7.

The Second Circuit in *In re McFarlin's* echoes this conclusion: "An employer's withdrawal liability payment . . . is the means by which the employer funds benefits that his employees have 'earned' by their past service and that he would normally finance through continuing contributions to his employees' pension plan." 789 F.2d at 104. Accordingly, to the extent that a portion of the benefits correlate to the employees' post-petition service, the benefit is akin to direct compensation provided in exchange for post-petition services, which undisputedly qualifies as an administrative expense. *See Howard Delivery Serv.*, 547 U.S. at 659 (noting that employee benefits compliment and/or substitute hourly wage compensation).

Although Marcal LLC paints the amount of withdrawal liability it owes as wholly subject to the whims of the market and actuarial assumptions, it ignores the fact that pursuant to Marcal's agreement to provide a defined benefit, it assumed those risks with open eyes. Marcal LLC's continued emphasis on the fact that Marcal had made all required plan contributions is a red herring; Marcal's promise to its employees was not just to provide contributions, but to provide a certain benefit. As we have explained, "[u]nfunded vested benefits [from which withdrawal liability is calculated] are benefits which are 'promised and earned but not yet funded' as of the calculation day. The liability for [unfunded vested benefits] represents a pre-existing obligation on the employer's part, and is not simply 'incurred' as of the date of withdrawal. In other words, the unfunded vested benefit calculation represents an employer's share of the amount needed for a fund to break even *as of the calculation date*." *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 96 (3d Cir. 1990), *overruled on other grounds by Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414 (1995) (internal citation omitted). Put differently,

12

withdrawal liability is intended to make up for any deficiency in the fund's assets—any such deficiency would prevent the employer from fulfilling its promise to provide a specific retirement benefit, a promise which is made in exchange for the employees' work.

Marcal LLC's second argument is that withdrawal liability is not designed to benefit the employees who provide the post-petition service. Instead, it argues, withdrawal liability is intended to benefit (1) the other employers within the TENJ Pension Fund, (2) the Pension Benefit Guaranty Corporation insurance scheme which may have to make up any shortfall, and (3) all of the employee-beneficiaries of the plan, not just those who worked for Marcal. Importantly, Marcal LLC concedes that withdrawal liability is, at least in part, designed to benefit the employee-beneficiaries who worked for Marcal.

Although both the Senate and House explanations for the MPPAA discuss how withdrawal liability would protect the other employers and prevent collapse of the plan, the simple fact is that the plan exists for the benefit of the employees. The legislative history of the MPPAA emphasizes that absent withdrawal liability, the employees are harmed. *See*, *e.g.*, Joint Explanation at S20191-92 (noting that when withdrawal occurs, "the plan is unlikely to have the resources necessary to *provide benefits promised to employees*" and that the reasons for the change are "that the current rules governing an employer's liability upon withdrawal from a multiemployer plan *fail adequately to protect plan participants*, the employers who remain in the plan, and the PBGC premium payers") (emphasis added). Because withdrawal liability ensures that there are enough plan assets to provide promised benefits, it is provided in consideration for the employees' willingness to continue to work.[3]

---

[3] Marcal LLC also contends that withdrawal liability is not based on "services rendered" to the estate. Appellant's Br. at 16, 21. As explained, because withdrawal liability is based on the proportional amount

13

Finally, Marcal LLC contends that even if withdrawal liability is, in part, consideration in exchange for employees' post-petition work on behalf of the debtor-in-possession, the amount attributable to the post-petition work cannot be calculated. We see no reason why the post-petition withdrawal liability is incapable of calculation.[4] To the extent that withdrawal liability includes new vested benefits that arose from the post-petition work of covered employees, one can determine the extent to which those benefits have become underfunded.

Our conclusion that post-petition withdrawal liability should be classified as an administrative expense is consistent with decisions of other courts that have addressed the issue. The Second Circuit, the only other Court of Appeals to address this issue, has suggested that post-petition withdrawal liability can be considered an administrative expense. *In re McFarlin's, Inc.*, 789 F.2d at 101-04. Although the court in *In re McFarlin's* ultimately declined to classify the withdrawal liability as an administrative expense, it did so because under the facts of that case the withdrawal liability was based on "a period pre-dating the McFarlin's Chapter 11 proceeding and cannot therefore be treated as an administrative expense." *Id.* at 104 n.2. The court's analysis

---

of contributions the employer owed over the prior five years, which in turn was based on the amount of work the employees provided, withdrawal liability does bear a casual connection to services rendered.

[4] The District Court did not calculate the post-petition portion of the withdrawal liability and left the calculation to the Bankruptcy Court on remand. *Trucking Emps. of N. Jersey Welfare Fund, Inc.,* 2009 WL 3681897, at *8. Accordingly, the actual calculation in this case is not before us. To the extent that we discuss the possible calculation of the post-petition withdrawal liability, it is merely to demonstrate that it can be calculated and does not, as Marcal LLC suggests, prevent a portion of the withdrawal liability from being classified as an administrative expense.

14

clearly supports a conclusion that post-petition withdrawal liability can be considered an administrative expense.

Other courts have reached the same conclusion. *See In re Great Ne. Lumber & Millwork Corp.*, 64 B.R. 426, 428 (Bankr. E.D. Pa. 1986) ("the consideration supporting the withdrawal liability is . . . the same as that supporting the pensions themselves, the *past* labor of the employees . . . [t]o the extent that the withdrawal liability is attributable to postpetition employment, the claim would be entitled to administrative status"); *In re Cott Corp.*, 47 B.R. 487, 495 (Bankr. D. Conn. 1984) (holding that withdrawal liability for the post-petition time period was an administrative claim and that withdrawal liability is capable of being divided).[5]

Third Circuit cases holding that other types of benefits can be apportioned between the pre- and post-petition period also support our conclusion. In *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219 (3d Cir. 2002), the employer promised "Stay-On Benefits" to entice employees to continue working while the employer liquidated its assets. The benefits were based on work the employees provided both pre- and post-petition. *Id.* at 225-26. The employees argued that the entire benefit should be classified as an administrative expense

---

[5] The case relied on most heavily by Marcal LLC is *In re HNRC Dissolution Co.*, 396 B.R. 461 (B.A.P. 6th Cir. 2008). We believe that this case was wrongly decided and that the BAP's conclusion runs afoul of some of its own analysis. For example, the panel recognized that the debtor-in-possession "unquestionably" benefited from the continued work of the covered employees, but held that the consideration for this post-petition work was limited to the wages paid and accrual of other benefits, such as vacation. *Id.* at 476. However, as the panel recognized elsewhere, the post-petition work also accrued the employees' pension credits, entitling them to pension benefits. *Id.* at 470. To the extent withdrawal liability is an employer's consideration in order to ensure those benefits can be paid, it qualifies as an administrative expense.

15

because an employee could not receive the benefit unless he or she worked until the end of the liquidation. *Id.* at 224-25. We rejected this claim, and held that to the extent the benefit was linked to both pre- and post-petition work, only that portion attributable to the post-petition period was entitled to priority. *Id.* at 227. There is no reason why the same should not hold true here.

Similarly, in *In re Roth Am., Inc.*, 975 F.2d 949, 957 (3d Cir. 1992), we held that vacation and severance benefits that were based on the length of employment "only have administrative priority to the extent that they are based on services provided to the bankruptcy estate post-petition." Put simply, many situations can arise whereby the promised employee benefit is in consideration for work that occurred both pre- and post-petition and we have held that the benefit should be and can be apportioned accordingly. Withdrawal liability is one of those situations and we see no reason to treat it differently.

In holding that withdrawal liability can be apportioned between pre- and post-petition time periods and that the post-petition portion can be classified as an administrative expense, we harmonize the purposes of the Bankruptcy Code and ERISA, as amended by the MPPAA, as we are required to do. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The Courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). As discussed, the narrowly tailored definition of administrative expense contained in the Bankruptcy Code is designed to balance two goals: the continued functioning of the debtor-in-possession and preservation of the estate for downstream creditors. By allowing only that portion of withdrawal liability attributable to the post-petition work to be classified as an administrative expense, we ensure that workers are provided the full benefit of the bargain promised to them in the continued-CBA, incentivizing their work for the DIP and ensuring its continued functioning. At the same time, by limiting what

16

constitutes an administrative expense to only that portion of the withdrawal liability which can be fairly allocated to the post-petition period, we help preserve the estate and prevent it from being devoured by the entire withdrawal liability claim.

Perhaps even more importantly, by permitting the post-petition portion of the withdrawal liability to be classified as an administrative expense, Congress' objectives in passing the MPPAA are fulfilled. If withdrawal liability in its entirety were automatically classified as a general unsecured claim, it would greatly undercut the purpose of the MPPAA to secure the finances of pension funds and prevent an employer's withdrawal from negatively affecting the plan and its employee beneficiaries.

## IV.

For the foregoing reasons, we will affirm the judgment and remand to the District Court for proceedings consistent with this opinion.