**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3386
_____

IN RE:  ID LIQUIDATION ONE, LLC, et al.,

Debtors


ROSS J. MANGANO, both individually and as a trustee of
the Jane C. Warriner Trust dated Feb. 26, 1971,
the J. Oliver Cunningham Trust dated Feb. 26, 1971,
and the Anne C. McClure Trust dated Feb. 26, 1971;
JOHN C. WARRINER; TROON & CO.;
OLIVER ESTATE INC.; OLIVER RACING LLC,

Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. No. 12-cv-01089)
District Judge: Hon. Richard G. Andrews
_____

Submitted Under Third Circuit LAR 34.1(a)
February 14, 2014
_____

Before: McKEE, Chief Judge, CHAGARES and SHWARTZ, Circuit Judges.

(Filed: February 19, 2014)
_____

OPINION
_____

SHWARTZ, Circuit Judge.

This appeal arises out of the Chapter 11 bankruptcy of Indianapolis Downs, LLC (n/k/a ID Liquidation One, LLC) and Indiana Downs Capital Corp. (n/k/a ID Liquidation Two, Inc.) (the "Debtors"[1]).  Ross J. Mangano, both individually and as the trustee of the Jane C. Warriner Trust dated February 26, 1971, the J. Oliver Cunningham Trust dated February 26, 1971, the Anne C. McClure Trust dated February 26, 1971, Oliver Estate, Inc., Oliver Racing, LLC, Troon & Co., and John C. Warriner (the "Oliver Parties") appeal the District Court's order affirming an order of the Bankruptcy Court approving a settlement between the Debtors and Power Plant Entertainment Casino Resorts Indiana, LLC and Live!Holdings, LLC (the "Cordish Entities"[2]) under Fed. R. Bankr. P. 9019. For the reasons set forth below, we will affirm.

I

As we write principally for the benefit of the parties, we recite only the essential facts and procedural history.  The Debtors operated a combined casino and race track in Shelbyville, Indiana.  The Cordish Entities and the Debtors entered into an agreement for the Cordish  Entities to construct and manage the casino (the "Management Agreement")

---

[1] For convenience, we will refer to the Debtors to discuss any events or acts associated with either Indianapolis Downs, LLC or Indiana Downs Capital Corp.

[2] For convenience, we will refer to the Cordish Entities to discuss any events and acts associated with either Power Plant Entertainment Casino Resorts Indiana, LLC or Live!Holdings, LLC.

and a trademark license agreement (the "Trademark Agreement").[3]  The trusts that are among the Oliver Parties provided "equity behind the casino."  App. 649.

In 2010, the Debtors, believing that the Cordish Entities engaged in questionable accounting actions in connection with the construction and management of the casino, terminated the Management Agreement.  The Cordish Entities challenged the termination and demanded arbitration (the "Arbitration").  The Debtors asserted counterclaims and defenses in the arbitration against the Cordish Entities based on the alleged mismanagement of the casino (the "Counterclaims").

In February 2011, the Cordish Entities filed suit in Maryland state court against the Oliver Parties and others seeking to recover damages from the termination of the Management Agreement, including for slander allegedly committed by the Oliver Parties (the "Maryland Litigation").[4]  The Cordish Entities did not name the Debtors as defendants in the Maryland Litigation.

Two months later, the Debtors commenced Chapter 11 bankruptcy proceedings. Among the creditors are the Cordish Entities,[5] the Oliver Parties,[6] Fortress Investment

---

[3] The Trademark Agreement granted the Debtors a royalty-free, non-exclusive right to use certain Live! marks in the naming and promotion of the casino.

[4] The Maryland Litigation includes claims based upon the termination of the Management Agreement that overlap with issues in this case and other allegations not relevant here.

[5] The Cordish Entities initially filed a proof of claim asserting a general unsecured claim and later filed an administrative priority claim arising from the Debtors' use of their trademarks.

Group ("Fortress"),[7] and the Ad Hoc Committee.[8]  The Ad Hoc Committee and Fortress held a large majority of the Debtors' debt.  As part of the Chapter 11 proceeding, the Debtors also commenced an adversary proceeding to enjoin the Maryland Litigation because of its relation to the Debtors' bankruptcy case (the "Maryland Adversary Action"), but the Bankruptcy Court ultimately denied the Debtors' request for injunctive relief.

In August 2011, the Debtors unsuccessfully sought to settle their disputes with the Cordish Entities.  Thereafter, the Debtors filed a motion under Fed. R. Bankr. P. 2004 for permission to obtain discovery from the Cordish Entities about the Counterclaims, but it was denied.

On February 13, 2012, the Cordish Entities filed a motion for the allowance and payment of an administrative expense claim against the bankruptcy estate, which consisted of an administrative priority claim for no less than $33 million[9] based on the Debtors' post-petition use of the Cordish Entities' trademarks (the "Administrative

---

[6] The Oliver Parties assert various claims in the bankruptcy, including general unsecured claims, a third priority lien claim, and a $3.8 million administrative expense claim that Fortress and the Ad Hoc Committee challenge.

[7] Fortress is the owner of a portion of the second lien debt and a substantial majority of the third lien debt.

[8] The Ad Hoc Committee represents holders of the second lien debt.

[9] The Cordish Entities' expert later opined that the amount of the alleged claim was closer to $17 million.

Claim").[10]  In response, on March 9, 2012, the Debtors filed a complaint against the Cordish Entities to contest the Administrative Claim and assert the Counterclaims (the "Cordish Adversary Action").  The Bankruptcy Court ultimately dismissed the Cordish Adversary Action, concluding that it arose from pre-petition activity that was subject to binding arbitration.

Thereafter, the Debtors, the Oliver Parties, Fortress, and the Ad Hoc Committee filed objections to the Administrative Claim, with the Debtors asserting that the Administrative Claim should be reduced by any amounts awarded to the Debtors in the Arbitration based on the Counterclaims.  Two days before the trial on the Administrative Claim, the Debtors and the Cordish Entities settled all claims between them (the "Settlement").[11]  The Settlement allowed for an Administrative Claim of $3.5 million, a reduced unsecured claim for the Cordish Entities, a release of the Debtors' Counterclaims, a letter disclaiming any wrongdoing by the Cordish Entities, and the rejection[12] of all agreements between the parties.  Fortress and the Ad Hoc Committee

---

[10] To qualify for administrative priority, an expense must: (1) "arise from a [post-petition] transaction with the debtor-in-possession and the expense must be beneficial to the debtor-in-possession in the operation of the business" and (2) the expense must be "actual and necessary."  In re Marcal Paper Mills, Inc., 650 F.3d 311, 314-15 (3d Cir. 2011) (internal quotation marks omitted) (alteration in original).

[11] The Settlement was the result of lengthy negotiations led by Fortress.  Because Fortress and the Ad Hoc Committee represented the majority of secured debt, they had a strong interest in ensuring that the costs of litigation and the Cordish Entities' administrative priority claim remained low.

[12] Under 11 U.S.C. § 365, a trustee may assume or reject any executory contract of the debtor.

supported the Settlement, but the Oliver Parties objected to it. Following oral argument, the Bankruptcy Court approved the Settlement. The Oliver Parties appealed that approval to the District Court, and the District Court affirmed. This appeal followed.

## II

The District Court had jurisdiction over the bankruptcy appeal under 28 U.S.C. § 158(a)(1). We exercise appellate jurisdiction over the appeal from the District Court's final order pursuant to 28 U.S.C. §§ 158(d)(1) and 1291.[13] We review the approval of a settlement for an abuse of discretion. In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006). Under this standard,

> [w]e do not disturb an exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. Put another way, for us to find an abuse of discretion the District Court's decision must rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.

Id. at 645 (internal citation and quotation marks omitted) (alteration in original).

## III

Under Fed. R. Bankr. P. 9019, a bankruptcy court has the authority to "approve a compromise or settlement" of a claim "after notice [to the debtor, trustee and creditors] and a hearing" on the compromise. Fed. R. Bankr. P. 9019(a). The bankruptcy court must then decide whether the settlement is "fair and equitable," Nutraquest, 434 F.3d at

---

[13] We review findings of fact made by the bankruptcy court for clear error, and review questions of law de novo. Lebron v. Mechem Fin. Inc., 27 F.3d 937, 942 (3d Cir. 1994).

6

644 (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)), and "assess and balance the value of the claim that is being compromised against the value to the estate of . . . accept[ing] . . . the compromise" by considering: "(1) the probability of success in ligation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).

The Bankruptcy Court here considered and properly weighed the four Martin factors. The Court found that: (1) any probability of success was complicated by numerous substantive and evidentiary issues, (2) given the many claims between the parties, collection could be difficult, (3) the litigation involved a great deal of time, multiple hearings, and related litigations, and was therefore complex, and (4) the Settlement was in the best interest of the creditors, including employees, vendors, and customers of the Debtors, given the fact that the litigation with the Cordish Entities threatened the Debtors' ability to successfully move forward with their plan of reorganization. Furthermore, the Court placed "significant weight" on the fact that the Ad Hoc Committee and Fortress supported the settlement as they represented "the overwhelming economic interests in these cases" and have "the primary economic stake being affected by the [S]ettlement." App. 77-78. The Court also found that the Settlement was fair and equitable, given that the negotiations were conducted in good

7

faith and a special committee of the Debtors' board had approved and authorized the Settlement.

The Oliver Parties—the only objecting creditors—assert that the Bankruptcy Court abused its discretion in approving the release of the Counterclaims because it did not have an adequate record to evaluate the merits and value of those claims. While the Bankruptcy Court must of course rely on "facts, not allegations," TMT Trailer Ferry, 390 U.S. at 437, when evaluating a proposed settlement, there is no indication here that the Bankruptcy Court did not have the facts necessary to weigh the Martin factors and approve the Settlement.[14] The Oliver Parties attempt to differentiate the Bankruptcy Court's knowledge of the Administrative Claim, which they contend was sufficient to approve a release, from the Bankruptcy Court's knowledge of the Counterclaims, which they assert was insufficient because the Counterclaims were not part of the Bankruptcy Court case. This distinction, however, does not account for the entire record before the Bankruptcy Court. While it is true that the Bankruptcy Court had overseen contentious and extensive discovery, resolved motions, held a final pre-trial conference, conducted hearings on Daubert and other motions in limine, and was prepared to commence trial on

---

[14] In its oral decision, the Bankruptcy Court noted that it had dealt with all of this litigation from the outset, acknowledging that it was "a broad ranging substantial litigation that's been between the parties," but stating that "the elements of that litigation, the matters that are at issue, the amounts that are in controversy, and the nature of the claims back and forth have been well demonstrated to the Court, and [it had] more than sufficient familiarity with those issues to evaluate and assess the [D]ebtors' decision to settle." App. 78.

the Administrative Claim, it also had extensive exposure to the Counterclaims before it dismissed them. Not only had the Bankruptcy Court decided that motion to dismiss the Cordish Adversary Action after briefing and oral argument, but in connection with the motion to enjoin the Maryland Litigation, the Bankruptcy Court presided over at least two hearings, discovery disputes, and motions concerning the allegations in the Maryland Litigation and their relation to the Debtors' bankruptcy claims and the Counterclaims. This provided the Bankruptcy Court with significant exposure to the facts underlying the Counterclaims and a window into their value and chances for success.

The Bankruptcy Court thus had knowledge of the facts underlying both the Administrative Claim and the Counterclaims and it was not relying on "bald assertions" by the parties. TMT Trailer Ferry, 390 U.S. at 439. It used what it knew about the multiple claims at issue to compare the "limited . . . prospect of the achievement of real value . . . with the concrete opportunity for reorganizing" and determined that "the [D]ebtors' decision to settle and walk away from [the] [C]ounterclaims in the context of an overall settlement . . . reflects the exercise of their best business judgment."[15] App. 81-82. The Bankruptcy Court was not required to have an evidentiary hearing on the

---

[15] The Oliver Parties attempt to characterize the Debtors' abandonment of the Counterclaims and willingness to issue the letter disclaiming any wrongdoing by the Cordish Entities as "contradictory" to their previous position and assertions before the Bankruptcy Court. Appellant Br. 23-24. The Debtors did, of course, represent that the Counterclaims had merit, but making the business judgment to settle them now does not wholly contradict their past advocacy. As the Debtors point out, they attempted to unsuccessfully settle the Counterclaims once before.

merits of all claims before approving the Settlement—in fact, the avoidance of litigating the issues is one of the main advantages of settlement. Depoister v. Mary M. Holloway Found., 36 F.3d 582, 586 (7th Cir. 1994); see also In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (noting that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement"); In re Capmark Fin. Grp. Inc., 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."). Rather, it need only have a record upon which it can make its determination, and it had such a record here. Thus, mindful of the Supreme Court's admonition that "[i]f, indeed, the record contain[s] adequate facts to support the decision of the trial court to approve the proposed compromises, a reviewing court would be properly reluctant to attack that action solely [even when] the court failed adequately to set forth its reasons or the evidence on which they were based," TMT Trailer Ferry, 390 U.S. at 437, we will not disturb the Bankruptcy Court's ruling as there was an adequate factual basis to approve the Settlement.

IV

For the foregoing reasons, we will affirm the District Court's order affirming the order of the Bankruptcy Court approving the Settlement.